JOSEPH WHARTON, appellant,

*v.*

LUKE J. STOUTENBURGH, respondent.

1. The fact that parties negotiating a contract contemplated that a formal agreement should be prepared and signed, is some evidence that they did not intend to bind themselves until the agreement was reduced to writing and signed. But, nevertheless, it is always a question of fact, depending upon the circumstances of the particular case, whether the parties had not completed their negotiations and concluded a contract definite and complete in all its terms, which they intended should be binding upon them, and which, for greater certainty or to answer some requirement of the law, they designed to have expressed in a formal written agreement.

2. Where, in cases within the statute of frauds, the negotiations have been conducted in writing, if there has been a final agreement between the parties, the terms of which are evidenced in a manner to satisfy the statute, the agreement will be binding, although the parties may have declared that the writing is to serve only as instructions for a formal agreement, to be prepared and signed. As soon as the fact is established of the final mutual assent of the parties to certain terms, and those terms are evidenced by any writing signed by the party to be charged or his lawfully-authorized agent, there exist all the materials which the court requires to make a legally-binding contract.

3. Where the negotiations have been conducted by parol, or are partly evidenced by writings duly signed and partly rest in parol, and specific performance is sought on the ground of part performance, the terms of the contract must appear clearly, definitely and unequivocally. But it is sufficient that the terms of the contract be made out in a manner satisfactory to the court. The fact that the details of the agreement are controverted by the parties will not deter the court from ascertaining what the terms of it really were and giving effect to the agreement, if the complainant shows himself entitled to a specific performance, by a part performance, which shall be referable only to a part execution of the agreement.

4. Delivery of possession by a vendor or lessor, accepted and acted upon by the vendee or lessee, is such an act of part performance by the former as to take the contract out of the statute of frauds, and to justify a decree of specific performance against the latter.

5. Courts of equity will refuse to exercise jurisdiction by way of specific performance in a class of special and exceptional contracts, where the terms and provisions are such that the court could not carry its decree into effect

Wharton v. Stoutenburgh.

without exercising some personal supervision and oversight over the work to be done, extending over a considerable period of time, such as agreements to repair or build, to construct works, build or carry on railways, mines, and the like. A contract for a lease of mines, to be worked in a specified manner, is not within this principle. The court, in such cases, can grant relief at once by a decree that the lease be executed, leaving the complainant to his legal remedy thereafter for breaches of the covenants contained in it.

6. Parties made an agreement for a lease for a term of years—the agreement was not in writing and signed as required by the statute of frauds—the lessee took possession, and then refused to execute a lease. On a bill by the lessor for a specific performance—*Held*, that it was proper that it should be decreed that the lease to be executed should bear date as of the time when possession was taken.

----

On appeal from a decree for specific performance of a contract to accept a mining lease of lands, advised by Vice-Chancellor Dodd.

This bill was filed by the complainant, who is the respondent in this court, for the specific performance of an agreement for a lease.

The complainant is the owner of a tract of mineral lands containing about one hundred and ten acres, situate in the county of Morris, on which two separate veins of iron ore had been opened and worked.

Early in January, 1880, James H. Collins, agent of Mr. Wharton, proposed to Mr. Stoutenburgh to make a lease of the mine to Mr. Wharton, who resided in Philadelphia. As the result of such conference, Mr. Stoutenburgh made and signed the following proposition, to be sent by Mr. Collins to Mr. Wharton:

"January 9th, 1880.

"The lower mine I will lease in permanence for twenty years, with the usual conditions of surrender in case the mines may prove unproductive, for seventy cents a ton, with usual privilege of necessary buildings.

"The upper mine I will lease for twenty years at the rate of royalty of fifty cents a ton for the first two years—sixty cents a ton thereafter—pig-iron remaining not above thirty dollars per ton; but when pig-iron shall be worth thirty dollars or over, seventy cents royalty, so long as pig-iron remains over

Wharton v. Stoutenburgh.

said thirty dollars. Or, I will lease all the mines on Mine Farm to Mr. Wharton for twenty years at the rate of seventy cents royalty, but will require the working of both veins.

"L. I. STOUTENBURGH."

This proposition was sent to Mr. Wharton, who made the following reply :

"PHILADELPHIA, January 21st, 1880.

" L. I. Stoutenburgh, Esq.:

" DEAR SIR—Mr. Collins reports that under all the circumstances he advises my acceptance of your proposition of ninth instant, for leasing your magnetic ore lands on Schooley's Mountain. This I concluded to do, and in fact have regarded the arrangement virtually made since receiving your said proposition.

" Of course a formal lease will be prepared and signed by us at a more convenient time, before the expiration of your existing contract to deliver ore, which I understand will be complete some time in March.

" Please acknowledge receipt of this and thus confirm the bargain.

" Yours truly,          JOSEPH WHARTON."

In answer to the last above, Mr. Stoutenburgh sent the following :

· " SCHOOLEY'S MOUNTAIN, January 23d, 1880.

" Joseph Wharton, Esq.:

" DEAR SIR—Yours of the 21st instant, by the hands of Mr. Collins, is received.

" In reply would say that I will adhere to the proposition made you through Mr. Collins on the 9th instant, although my mine is looking much more promising than then. I infer from your letter that you wish not only the one mine that I am now working, but that your lease should include all the magnetic ore of the farm.

" As there are two distinct veins of ore, each of which have been opened and partially worked, you will remember that my proposition specified the working of each vein, so that I would have a greater income from both than from one.

" At the time of making the proposition to Mr. Collins it was also understood that if you should lease the whole property that you would take my machinery and mining improvements at a fair valuation.

" I have thought best to mention these items so as to have no misunderstanding about it when the lease is taken.

" I expect to complete my contract with the Lehigh Iron Company about the middle of March.

" In order to have all things ready in time for you to take possession at the termination of my contract with said company, I will write and send you such

Wharton *v.* Stoutenburgh.

a lease as I may think equitable, for your consideration and approval, if it shall suit you.     I am very respectfully yours,

           " L. I. STOUTENBURGH."

The above letter of the 23d of January was endorsed and sent in one to Mr. Collins, of the 24th, of which the following is a copy :

           "SCHOOLEY'S MOUNTAIN, January 24th, 1880.

*" J. H. Collins, Esq. :*

    " DEAR SIR—-Inclosed please find an open letter to Mr. Wharton, which if on reading you find to accord with my proposition of the 9th inst., and our conversation about machinery &c., please forward to him. If not, then please return to me, with comments.

        " I am very respectfully yours,      L. I. STOUTENBURGH."

The letter of the 23d of January was forwarded to Mr. Wharton by Mr. Collins, without the return, with comments, mentioned in the letter to him of the 24th.

As the outcome of the correspondence between the parties, Stoutenburgh prepared a lease and sent it to Wharton. Subsequently the parties by appointment met at the Clarendon Hotel, in Hackettstown, on the 25th of February, 1880, to consider the details of the draft prepared by Stoutenburgh. Alterations and changes were made in its provisions, and erasures and interlineations were made accordingly.

The draft, as corrected, was left with Stoutenburgh, that a lease in duplicate might be prepared and sent to Wharton for signature. Within two or three days after the interview at Hackettstown, Stoutenburgh prepared two copies of a lease, which he signed and sealed and forwarded to Wharton, in Philadelphia—one to be retained by him, and one to be executed and returned. Wharton acknowledged the receipt of these papers as follows :

           "CAMDEN, N. J., March 4th, 1880.

*" L. I. Stoutenburgh, Esq. :*

    "DEAR SIR—I have your two copies of the lease and shall give the matter attention to-morrow. Was closely occupied with other matters yesterday, and shall be to-day. The house you spoke of had better be shown to Collins. What do you ask for it? I should think he might want it.

        "Truly yours,       JOSEPH WHARTON."

The mines and premises were taken possession of by Wharton on the 6th of March, 1880, through his agent and employees. Possession was retained until the following month of August, when the defendant quit the premises.

In November, 1880, Stoutenburgh filed a bill against Wharton, praying that the defendant be decreed to execute and deliver the lease, as mutually agreed on by the parties, at Hackettstown, on the preceding 25th of February, 1880. The chancellor, on the advisory opinion of the vice-chancellor, made a decree accordingly. From that decree this appeal was taken.

*Mr. Peter L. Voorhees*, for appellant.

I. No specific performance of a contract will be decreed unless the contract be actually concluded and be certain in all its parts. If the matter is still pending or rests in treaty, or if the agreement, in any essential particular, be uncertain, equity will not interfere. *Pomeroy on Spec. Perf.* §§ *35, 36, 58; Fry on Spec. Perf.* § *203, Waterman on Spec. Perf.* § *141; McKibbin* v. *Brown,* 1 *McCart. 13; Potts* v. *Whitehead,* 5 *C. E. Gr. 55.*

II. The mere approval of a draft of a contract does not constitute such an agreement as will be decreed to be specifically performed. *Fry on Spec. Perf.* § *342; Pomeroy on Spec. Perf. 87, notes to* § *63; Waterman on Spec. Perf. 175, notes to* § *135; Potts* v. *Whitehead,* 5 *C. E. Gr. 58; S. C., 8 C. E. Gr. 514; Warren* v. *Wellington,* 3 *Drew. 523; Doe* v. *Pendegrifth,* 3 *C. & P. 312.*

III. Courts of equity will not enforce the specific performance of a contract if it be reasonably doubtful whether the contract was finally concluded. *Fry on Spec. Perf.* §§ *164, 165; Pomeroy on Spec. Perf.* § *58; Waterman on Spec. Perf.* § *132; Huddleson* v. *Briscoe,* 11 *Ves. 591, 592; Statford* v. *Bosworth,* 2 *Ves. & B. 341, 345, 346; Brown* v. *Wilson,* 2 *C. E. Gr. 180.*

IV. In order to take a case out of the statute of frauds, by

part performance, two things are necessary. The terms of the agreement must be established by proofs clear and definite, and the act relied upon as part performance must be exclusively referable to the contract and done after the contract made. *Pomeroy on Spec. Perf.* §§ *102, 107, 123, 125, 130, 136 ; Wallace* v. *Brown, 2 Stock. 308, 309 ; Brewer* v. *Wilson, 2 C. E. Gr. 180 ; 1 Stew. Dig. 528,* § *86,* and cases ; *Eyre* v. *Eyre, 4 C. E. Gr. 102 ; Petrick* v. *Ashcroft, 4 C. E. Gr. 339 ; Ackerman* v. *Ackerman, 9 C. E. Gr. 315 ; S. C., Id. 585 ; Cole* v. *Potts, 2 Stock. 67 ; Smith* v. *McVeigh, 3 Stock. 239.*

V. A contract will not be enforced if it was induced by misapprehension or misrepresentation. *Fry on Spec. Perf.* §§ *425, 426, 432, 437, 455, 457 ; Pomeroy on Spec. Perf.* §§ *38, 210, 217 ; Waterman on Spec. Perf.* §§ *118, 308, 310 ; Fisher* v. *Worrall, 5 Watts & S. 478, 482.*

VI. When a contract is not fair and its enforcement would be oppressive, equity will not decree a specific performance. It is matter of discretion. *Pomeroy on Spec. Perf.* §§ *35, 38, 40, 177, 185, 188 ; Waterman on Spec. Perf.* §§ *6, 168, 169 ; Crane* v. *Decamp, 6 C. E. Gr. 414.*

VII. When a contract is a continuing one, running through an extended term, or where it provides that one of the parties may abandon contract on giving a year's notice, it will not be enforced. *Pomeroy on Spec. Perf.* §§ *42, 289, 307, 312 ; Waterman on Spec. Perf.* §§ *197, 198 ; Marble Co.* v. *Ripley, 10 Wall. 339, 359 ; Rops* v. *Pacific R. R., 1 Woolw. 264, 448 ; Fallon* v. *R. R. Co., 1 Dill. 121 ; Blachett* v. *Bates, L. R. (1 Ch. App.) 117, 124 ; Hill* v. *Croll, 2 Phil. 60.*

*Mr. H. C. Pitney,* for respondent.

I. The correspondence of January, comprised in complainant's proposition of January 9th, defendant's letter of January 21st, and complainant's reply, make out a complete contract in writing, signed by the parties, subject only to the contingency of

their agreeing upon the details of the lease. They afterwards did agree fully and completely upon the terms of that lease.

II. Under such circumstances the original contract will be enforced, and the statute of frauds is satisfied. *Chinnock* v. *Marchioness of Ely, 11 Jur. (N. S.) 32; 2 Hem. & M. 220; 4 De G., J. & S. 638, 646; Honeyman* v. *Maryott, 1 Jur. (N. S.) 857, 21 Beav. 14.*

III. Defendant received the leases, duly executed by complainant, on or before March 4th, and kept them without returning them until May 27th.

IV. But if the court should hesitate to decree specific performance for the reasons thus far presented, their still remains the further and decisive consideration of part performance.

Possession was abandoned by complainant and taken by defendant's agent, March 6th. *Pyke* v. *Williams, 2 Vern. 455,* and Raithby's note; *Aylesford's Case, 2 Str. 783; Harris* v. *Knickerbocker, 1 Paige 209; S. C., 5 Wend. 638; Pugh* v. *Good, 3 Watts & S. 56; Bowers* v. *Cator, 4 Ves. 91; Parker* v. *Smith, 1 Coll. C. C. 608; Coles* v. *Pilkington, L. R. (19 Eq.) 174.*

V. All mines are peculiarly speculative and uncertain in value, and so recognized by the courts. Defendant was himself an expert, and the courts do not permit such persons, dealing in such property, to recede from their contracts on account of any change in the prospects of the yield, when they have themselves inspected the property. *Fry on Spec. Perf.* §§ *437, 438, 440, 443, 444, 445; Atwood* v. *Small, 6 Cl. & Fin. 167, *232; Clapham* v. *Shillito, 7 Beav. 146; Jennings* v. *Broughton 17 Beav. 234, 17 Jur. 905, 5 De G., McN. & G. 126.*

VI. As to its being a hard contract, see *Fry on Spec. Perf.* §§ *252, 256, 257; Waterman on Spec. Perf.* §§ *165–173; Low* v. *Treadwill, 12 Me. 441–450; Lee* v. *Kirby, 104 Mass. 420–428.*

VII. It was argued below that this was an attempt on the

part of complainant to induce the court to enforce a continuing contract by ordering defendant to work a mine and raise ore; and it was urged that the court would not undertake the task of supervising the working of a mine.

This is fallacious. We are not asking the court to carry out a continuing contract. What we ask and all we ask is that defendant shall execute this lease according to his agreement, and that it should be dated back to the time when he should have executed it, as was done in *Pain* v. *Coombs, 1 De G. & J. 34.*

The opinion of the court was delivered by

DEPUE, J.

The principal ground of contention against this decree was, that no contract, definite and complete in all its terms, was concluded between the parties.

The fact that parties negotiating a contract, contemplated that a formal agreement should be prepared and signed, is some evidence that they did not intend to bind themselves until the agreement was reduced to writing and signed. But, nevertheless, it is always a question of fact, depending upon the circumstances of the particular case, whether the parties had not completed their negotiations and concluded a contract definite and complete in all its terms, which they intended should be binding, and which, for greater certainty, or to answer some requirement of the law, they designed to have expressed in some formal written agreement.

The question as to the degree of completeness in an agreement requisite to relief by way of specific performance has generally arisen when the negotiations have been conducted in writing, and the inquiry has been whether the writings produced comply with the requirements of the statute. In *Chinnock* v. *Marchioness of Ely, 4 De G. J. & S. 645–6,* Lord Westbury states, with precision, the doctrine of courts of equity. He says: "I entirely accept the doctrine that if there had been a final agreement, and the terms of it are evidenced in a manner

18

to satisfy the statute of frauds, the agreement shall be binding, although the parties may have declared that the writing is to serve only as instructions for a formal agreement, or although it may be an express term that a formal agreement shall be prepared and signed by the parties. As soon as the fact is established of the final mutual assent of the parties to certain terms, and those terms are evidenced by any writing signed by the party to be charged, or his agent lawfully authorized, there exist all the materials which this court requires to make a legally binding contract. But, if to a proposal or offer an assent be given, subject to a provision as to a contract, then the stipulation as to the contract is a term of the assent, and there is no agreement independent of that stipulation."

Substantially the same views are expressed by Lord Cranworth, in *Ridgway* v. *Wharton, 6 H. of L. Cas. 264, 268,* in which he affirms the binding force of an agreement, all the terms of which have been agreed on, though the parties contemplated that the agreement should be reduced into form before it is finally executed; and, in referring to the fact that a formal agreement was in contemplation before the business was to be concluded, as cogent evidence that the parties did not intend to bind themselves until the agreement was reduced into form, he adds: "That, however, is a question of fact, which must depend upon the circumstances of each particular case." Other cases to the same effect are collected in a note in *Pomeroy on Cont. 89.*

The doctrine of the courts is the same with respect to the enforcement of agreements within the statute of frauds, where the negotiations have been conducted by parol, or are partly evidenced by writings duly signed, and partly resting in parol, and specific performance is sought on the ground of part performance of the agreement. The terms of the contract must be established by proofs, clearly, definitely, and unequivocally. But it is sufficient that the terms of the contract be made out in a manner satisfactory to the court. The fact that the details of the agreement are controverted by the parties will not deter the court from ascertaining what the terms of it really were, and giving effect to the agreement where a complainant shows him-

Wharton v. Stoutenburgh.

self to be entitled to a specific performance, by a part performance, which shall be referable only to a part execution of the agreement. *1 Sugd. Vend. & Pur. [155] ¶ 10 ; Wallace* v. *Brown, 2 Stock. 308 ; Pomeroy on Cont. §§ 137–145.*

The agreement, as contained in the complainant's proposition of January 9th, 1880, and the defendant's reply of January 21st, 1880, was so incomplete as not to justify a decree of specific performance. Both parties then evidently contemplated a future settlement of the terms and details of a lease, thereafter to be agreed on. They subsequently, at the interview in Hackettstown of the 25th of February, 1880, completed the arrangements designed to perfect the understanding between them.

The vice-chancellor before whom this case was heard found, as a question of fact, that the draft of a lease prepared by Stoutenburgh, with the alterations and changes made in it at the interview in Hackettstown, was satisfactory to both parties, and that the writing, as amended and corrected, though not signed, was a full and complete expression of the terms and stipulations finally agreed on between them. A careful examination of the evidence leaves no doubt of the correctness of this conclusion.

The negotiations, as concluded in Hackettstown, although evidenced by the written draft of a lease as amended and altered by mutual consent, were not embodied in any agreement signed by the parties in conformity with the statute of frauds. If the matter had ended there, the statute would have been a complete defence. The defendant could then have rested successfully on what he calls, in his testimony, his option to sign the lease or not to sign it, as he thought proper.

But the evidence shows that a lease in duplicate was forwarded to the defendant for execution, shortly after the 25th of February, the receipt whereof was acknowledged by the defendant's letter of the 4th of March. On the 6th of March, the defendant's agent took possession of the premises. On the same day, the defendant, at Philadelphia, wrote a letter to the complainant, in which he says:

" In view of the great delays in getting furnace started, and in starting the hematite mines at Beattystown, and also in view of the large purchases of ore which I have made, I confess that the prospect of working your place looks less attractive and more onerous than it did. I wish, therefore, to let the matter stand, if it can be done without disadvantage to you, until I come up to Hackettstown, which I mean to do directly after hearing that the furnace is in blast; this, I imagine, will be about the middle of next week."

On the 9th of March the complainant replied, saying:

" You will allow me to say, in all kindness, that I was a little surprised in receiving your letter without the duplicate copy of lease that I sent you. I regarded our business as finally settled, at our last meeting at Hackettstown, as though the leases had there been formally signed, and have shaped all my business in accordance with that transaction. Have written to several gentlemen and companies which had put themselves in communication with me for the purchase or lease of the mine, that it was already positively and satisfactorily leased. This is the condition in which our affairs pertaining to the mine now are, and have been since Saturday, and, of course, any other arrangement than that specified in our contract would be damaging to me."

Possession was taken of the mine on the 6th of March, by the defendant's agent, without his knowledge, and on the complainant's suggestion, to prevent the flooding of the mine with water. But the defendant had notice early in April of what was being done, for he then sent up an engine and pump, with directions to have them set up in the mine. After complainant's letter of March 9th, the defendant was in duty bound to act with the greatest caution, if he did not mean to ratify what had been determined on at the interview in Hackettstown. He retained the leases the complainant had sent him, and continued to work the mine, and continued negotiations for a different bargain. He returned the leases on the 27th of May, with suggestions of alterations in them. Meanwhile, the price of pig iron had steadily declined. He kept possession until the 1st of August, having sunk a shaft twenty feet in depth, and sustained a loss, as he said, of about $2,000 in the working of the mine. The vice-chancellor, I think, rightly held that these acts were referable to the contract mutually agreed upon at Hackettstown; and delivery of possession by a vendor or lessor, accepted and

acted upon by the vendee or lessee, is such an act of part performance by the former as to take the contract out of the statute of frauds, and to justify a decree of specific performance against the latter. *Earl of Aylesford's Case,* 2 *Stra.* 783; *Bowers* v. *Cator,* 4 *Ves.* 91; *Harris* v. *Knickerbacker,* 5 *Wend.* 638; *Brown on Stat. of Frauds* § 471; *Pomeroy on Cont.* §§ 118–124.

Before leaving this subject, it is proper to refer to the fact that the leases forwarded by the complainant to the defendant, at Philadelphia, are not exact transcripts of the lease produced and altered at the Hackettstown interview. The variance was not alluded to in the subsequent negotiations between the parties, nor at the hearing before the vice-chancellor, and seems to have been discovered after this appeal was taken. If attention had been called to this fact in the court below, it might have been explained. At all events, the defendant has suffered no injury therefrom; for the court of chancery decreed the execution of the Hackettstown lease.

Another objection to the decree is endeavored to be rested on the doctrine that the court will not decree specific performance of a continuing contract. There is a class of special and exceptional contracts in which courts of equity refuse to exercise jurisdiction by way of specific performance. These are contracts having such terms and provisions that the court could not carry into effect its decree without some personal supervision and oversight over the work to be done, extending over a considerable period of time, such as agreements to repair or build, to construct works, to build or carry on railways, mines and the like. In such cases, the court declines to interfere, because of its inability to give relief by one decree. *Pomeroy on Cont.* §§ 307–312. The effort to range this case within this exceptional class of contracts is futile. The court can grant full relief at once, by a decree that the lease be executed, leaving the complainant to his legal remedy thereafter, for breaches of the covenants contained in it. Lord Cranworth, in *Blackett* v. *Bates, L. R.* (1 *Ch. App.*) 117, points out the distinction between cases such as that now in hand, and cases of the class in which the court will not entertain jurisdiction.

In that case, the controversy had been referred to an arbitrator. He had awarded that the defendant should execute to the plaintiff a lease of the right to use a certain part of a railway—the lease to be in words set out in the award. He had also awarded that the defendant should have certain privileges of use of the railway; but the lease he directed to be executed did not provide for such privileges. The court refused to decree specific performance of the award, for the reason that by such decree full relief could not be given to both parties; that the plaintiff would get at once, by the decree, what he sought—the lease; whereas, the defendant could not get what he was entitled to, which was a right to enforce performance, by the plaintiff, of daily duties, during the whole term of the lease, and the court had no means of enforcing such performance. But the lord-chancellor adds: "If the arbitrator, instead of awarding that the plaintiff should do certain acts, had awarded that the lease to be executed should contain covenants, by the plaintiff, to do them, the case would have stood on an entirely different footing. The court could not then have been called upon to enforce, either directly or indirectly, the doing of those acts, but merely to decree the execution of a lease containing certain covenants—a kind of relief which is clearly within the jurisdiction of the court, and open to no objection." The precedents are numerous of decrees directing the execution of mining and farming leases, containing stipulations with respect to the mode of working and cultivating, analogous to the covenants of the proposed lease with respect to the working of the mine and the payment of a royalty on the minerals raised. If the defendant shall be involved in difficulties with respect to past non-performance of his engagements, or in embarrassments in exercising his right of rescission, they will be the consequence of his own conduct in evading the due performance of his obligations.

The vice-chancellor properly disposed of the defence, that the agreement between the parties was induced by false and fraudulent representations with respect to the former productiveness of the mine.

The vice-chancellor properly directed that the lease, when

executed, should bear date on the 6th of March, 1880, when possession was taken. *Pain* v. *Coombs, 1 De G. & J. 34; Rankin* v. *Lay, 2 De G. F. & J. 65.*

The decree should be affirmed, with costs.

*Decree unanimously affirmed.*