The bill is for the specific performance of a contract to sell land. The Montclair board of education, April 24th, 1923, passed the following resolution:
"Mr. McKinney moved that this property [the land involved in this suit] be offered for sale at private sale to any purchaser who may offer at least the price of $29,260, and that it should be sold subject to restrictions and present encumbrances, and subject also to any liens for improvements that may have been made, and that the secretary be authorized to enter into a contract with any purchaser willing to pay that price on those terms and conditions, and that after consulting with the town attorney as to the proper form of deed to be drawn, the president and secretary be authorized to draw up, execute and deliver said deed." *Page 61 
The next day the complainant, at the instance of Union N. Bethell and his son Richard, submitted to the secretary of the board the following proposal, which was accepted:
"April 25, 1923.
Mr. Fred P. Reagle, Secretary, Board of Education, Montclair, New Jersey.
Dear Sir —
I hereby offer to purchase from the board of education of the town of Montclair, the real estate owned by it, being the plot of land on the easterly side of North Mountain avenue, having a frontage on North Mountain avenue of two hundred feet, and extending through to Edgemont road, as more particularly described in the advertisement in the Montclair Times of the issue of March 31st, for the sum of twenty-nine thousand two hundred and sixty [$29,260] dollars cash, to be paid one thousand [$1,000] dollars on the acceptance of this offer and the balance on passing of the title, within a reasonable time after the acceptance of this offer.
I will accept a title to the premises subject to restrictions and present encumbrances, and subject, also, to any liens for improvements that may have been made prior to this date, and will be glad to execute a formal contract for the same as soon as the same can be prepared and presented for signature.
I enclose herewith check for $1,000, being the original deposit.
Yours very truly,
[Signed] WM. WHITNEY AMES.
Accepted for the board of education, Montclair, N.J., April 25, 1923.
 [Signed] FRED P REAGLE, Sec."
Later, the board rescinded the resolution, and sold the land to the defendant French for the same price, and after this bill was filed conveyed it to him. He took with notice.
The background of this action is a long and bitter struggle between Mr. Bethell, a member of the board, to retain the land for a school site, and a group of residents of Montclair, who objected to a public school in their midst, in which village politics played no unimportant part. The group had the sympathy of three of the five members of the board and the strenuous opposition of Mr. Bethell, who consistently voted against all efforts to dispose of the land. On May 22d the group urged the board to reject Mr. Ames' contract, and a resolution was passed requesting him to withdraw. At *Page 62 
this meeting Mr. Bethell partly disclosed his hand by submitting the following:
"To the Board of Education:
Respecting the Edgemont land recently sold by the Board of Education, and the adjoining so-called Sussman lot, I am authorized to say that these properties will be held [unimproved] for a reasonable time so that the board may take them if they are desired for school purposes; that if, under condemnation, which may be necessary to remove restriction, the property is to bring less than the price paid by the present owner plus carrying charges and the usual five per cent. agent's commission, someone [but not the town] will lose the difference, and that if they bring more, the excess will be given to the board of education.
[Signed] U.N. BETHELL."
At a later meeting the solicitor of the board, to whom it had been referred, advised the board that he was of the opinion "that the whole proceeding is invalid, for the reason that the resolution passed by the board at the meeting of April 24th delegated to a ministerial officer, the secretary of the board, the duty of exercising a discretion in accepting a proposal for the Edgemont land," and also that "if any member of the board [meaning, of course, Mr. Bethell] is interested, directly or indirectly, in the contract for the purchase of the Edgemont property, the contract is invalid," and thereupon a resolution was passed canceling the Ames contract, and another was adopted to sell the property for $29,260, and upon a bid of that sum being submitted by one of the group, in the name of Mr. French, it was, on motion, accepted.
Now, to go back to the night of April 24th: When Mr. Bethell returned to his home after the meeting, he related to his son, Richard, what had happened, and it was arranged that the son should buy the property, the father to finance the project. The next morning Mr. Ames, under instructions, submitted the proposal and gave his own check for $1,000, the initial payment on the purchase. Richard borrowed a thousand dollars from a bank on his note, secured by collateral, which he deposited to Mr. Ames' credit to anticipate the latter's check. In order to finance the purchase, *Page 63 
and according to the plan, as related by him, Mr. Bethell bought a company which was about to surrender its charter, and conveyed to it his unproductive real estate in Montclair, and securities sufficient to carry this unproductive real estate, taking in payment capital stock of the company. Some of the stock he gave to his three sons, and much of it was put in trust for them when they reached the age of twenty-eight years, to interest them in business. His personal holdings in the company, he says, are now slight. He then entered into a written agreement with the company and his son Richard, that Richard should hold the school site unimproved for two years, and if in that time the board of education should take it by condemnation at a figure in excess of cost, plus carrying charges and five per cent. commission, Richard was to remit to the board the excess, and if the award was less, then the company was to make up the difference to Richard. The company was to reimburse Richard for the thousand dollars he had paid on the purchase price, and endorse his notes or lend him securities sufficient to raise the balance of the purchase price and all the carrying charges for four years. If the property was not taken by the board within two years Richard was to be at liberty to handle it as he pleased, he then to save the company harmless. For the doing of these things Mr. Bethell agreed to pay the company $3,000. It was further stipulated that he was not to participate in any profit that might accrue nor be liable for any losses that might be incurred, and that "his sole obligation is the payment of $3,000 to realty (the company), and the sole benefit to him is to secure for a reasonable period to the board of education the opportunity to acquire Edgemont, if it desires to, for school purposes, without undue cost." The company, of which Richard became the treasurer, advanced to him securities, which he posted with a trust company as collateral for a loan to pay the balance of the purchase price.
The cancellation by the board of the Ames contract was by no means in conscientious discharge of official duty. The stage had been set for the group to buy, and the board being *Page 64 
in no mood to be outwitted by Mr. Bethell, sought the opinion of its counsel, who pointed the way out of the dilemma. The first ground seized upon is not tenable. The authorization to its secretary to accept an offer binding the board was not an unlawful delegation of power. The price had been fixed and the exercise of the power involved neither judgment nor discretion. The secretary's action was purely ministerial and perfunctory.Hutchinson v. Trenton, 42 N.J. Law 72; Harcourt v. AsburyPark, 62 N.J. Law 158. The other, insinuating that Mr. Bethell was interested in the sale, rested in suspicion, which was deemed enough to serve the purpose. That the board was not at pains to prove the charge is of no importance if it was well founded, and is now established.
Richard is a young man of twenty-three, unemployed, lives with his father who supports him, has no means worth while, had little or no business experience, and none in real estate. He has a rich and kindly disposed father. There is no room for the slightest suspicion that Mr. Bethell's activities in the matter are not entirely unselfish, and that he was not actuated solely by a desire to serve his community and protect its interests, plus, perhaps, his determination not to be outdone by the group. But despite his sacrifices and the means he adopted to detach himself from the sale and from any possible profit and to remove all grounds for imputation of ulterior motives, and although he be justly entitled to his community's appreciation and gratitude, his underlying interest in the contract is sufficiently material to influence a court of equity, in the exercise of a sound discretion, not to enforce it. For, and it cannot be, plausibly, gainsaid, in the final analysis the contract, its fruits and consequences, is dominated and controlled by him as absolutely as if it were in his own name to do with as he will. Good faith of his intention to be disinterested must be conceded, but his power to rule his son and the destiny of the sale makes for that infection of the contract, which forbids its enforcement. It is an inexorable rule of common law, and it finds expression in our statute, that public servants *Page 65 
shall not be interested, directly or indirectly, in any contract made with public agencies of which they are members. Public service demands an exclusive fidelity. The law tolerates no mingling of self-interest. Crimes act § 32; Comp. Stat. p.1755; Wharton v. Stoutenburgh, 35 N.J. Eq. 266; Stroud v.Consumer, c., 56 N.J. Law 422; Sturr v. Elmer,75 N.J. Law 443; Stewart v. Lehigh Valley Railroad Co., 38 N.J. Law 505.
The bill will be dismissed.