JOHN VAN ITALLIE, PLAINTIFF-APPELLANT, v. BOROUGH
OF FRANKLIN LAKES, DEFENDANT-RESPONDENT.

Argued October 7, 1958—Decided November 17, 1958.

*Mr. Walter H. Gardner, Jr.,* argued the cause for plaintiff-appellant (*Messrs. Gardner & Williams,* attorneys; *Mr. David J. Caliri* on the brief).

*Mr. Fred G. Stickel, III,* argued the cause for defendant-respondent (*Mr. John H. Shields, Jr.,* attorney; *Mr. Fred G. Stickel, III* and *Mr. Howard E. Corbett* on the brief).

The opinion of the court was delivered by

PROCTOR, J.   Plaintiff, a taxpayer, filed a complaint in lieu of prerogative writ in the Superior Court, Law Division, challenging the validity of two ordinances of the Borough of Franklin Lakes, principally on the ground that a conflict of interest existed on the part of two of the borough council-men, Birrer and Bender.   Ordinance 139 regulates the location and establishment of cemeteries within the municipal boundaries and Ordinance 140 is a general amendment to the borough zoning ordinance.   At the close of plaintiff's case the trial court granted defendant's motion for a judgment of involuntary dismissal.   While plaintiff's appeal was pending in the Appellate Division we certified the cause on our own motion.

Franklin Lakes is a rural community in Bergen County encompassing about ten square miles.   It has a population of about 2,700 persons and approximately 750 homes.   An area of 1,250 acres, about one-fifth of the borough, is owned by the Archdiocese of Newark.

Zoning was instituted in Franklin Lakes in 1937 at which time, except for a small area in which business and industrial uses were permitted, the entire borough was zoned for residential use.   The minimum lot size permitted was 75 x 150 feet.   In 1953 by an amendment to the zoning law most of the borough was upgraded to minimum lots of one and two acres.   Since then the Archdiocese and a large number of property owners have strenuously objected, contending that it is impractical to develop residential property under a two-acre requirement.   As a result of these protests, almost immediately after the passage of the 1953 ordinance the

borough council and the planning board began a study point-
ing toward a revision of that ordinance. This study con-
tinued into 1957, when the ordinances now challenged were
adopted. In the course of such study the Archdiocese made
known at numerous meetings of the planning board and
council its various proposals for the use of its acreage. These
included a parochial school, a church and a cemetery. In
addition, it intended to sell a portion of its property for
purposes other than religious uses, namely, for the develop-
ment of residential, business and industrial uses. In 1955
the Archdiocese entered into a contract with Urban Farms,
Inc., for the sale and development of this land. The con-
tract was contingent upon a change in the zoning ordinance
because it was felt that development would not be possible
under the then existing zoning ordinance. The Archdiocese
also retained Urban Planning Associates to draft an appro-
priate re-zoning plan. Through these representatives the
Archdiocese submitted to the planning board a request for
re-zoning. This request contained numerous proposals in-
cluding a reduction of the two-acre requirement in portions
of the residential area to one-acre lots, re-zoning of 50 acres
for a memorial park cemetery, a cultural area, a church and
a parochial school. The proposed plan became the center
of controversy and a citizens' committee, of which the plain-
tiff was a member, was formed to oppose it. The principal
opposition was to the proposed reduction of the area com-
prising the two-acre zone established by the 1953 ordinance.
There was no objection to the proposed church, school and
cemetery. In August 1956 the planning board recommended
to the council the adoption of an ordinance embodying the
requests mentioned above. Other proposals of the Arch-
diocese were rejected. The recommended re-zoning encom-
passes lands in addition to those of the Archdiocese. As a
result of opposition to the recommendation, the council felt
an independent study would be desirable and George A.
Raymond Associates, planning consultant, was retained for
that purpose. It submitted its report to the council on

October 26, 1956. The Raymond report recommended the adoption of substantially all of the proposals with the exception of the reduction in area of the two-acre zone.

Ordinance 140 was introduced in the early part of 1957. On April 9, 1957 the planning board, of which Councilman Birrer was a member, recommended its adoption. On April 22, 1957, after an extensive public hearing, Ordinance 140 was adopted by a 4 to 2 vote by the council. Ordinance 139 was adopted by a 4 to 3 vote, the mayor having voted affirmatively to break a 3-to-3 council deadlock. At this meeting a letter was received from two citizens of the borough in which they questioned the legality of the vote of Birrer, for the reason that his brother was in the employ of a party interested in the passage of the ordinances. Councilmen Birrer and Bender voted for Ordinance 140. Birrer voted in favor of and Bender voted against Ordinance 139.

A synopsis of the pertinent changes in the zoning scheme brought about by Ordinance 140 is as follows: (1) it increased the area of AA (one-acre) residential districts, thereby decreasing the area of the AAA or two-acre residential zone. The new AA area was contained between two 500-foot contour lines and provided that property outside these lines exceeding an 8% grade would be in the AAA (two-acre) classification; (2) it permitted use of land in residential districts for "cemeteries when owned and operated by non-profit religious organizations"; (3) it created a new BB business zone for historical and cultural purposes, in which existing historical sites are to be maintained and in which a club house, a souvenir shop and a restaurant are permitted uses. Ordinance 139 regulates the location, establishment and operation of cemeteries authorized by Ordinance 140.

The pretrial order listed the following contentions of the plaintiff: (1) re-zoning of District AAA (two-acre) to District AA (one-acre) was unreasonable, capricious and arbitrary; (2) the BB zone constituted spot zoning; (3) Councilmen Birrer and Bender had a personal interest in the adoption of the ordinances and therefore should have been disqualified from voting thereon.

At the trial the plaintiff withdrew his first contention. He abandoned the second on this appeal. During the trial, however, in addition to the plaintiff's third contention the following matters were put in issue without objection: (1) the boundary lines between Districts AAA and AA are vague in that they contain an inadequate standard; (2) permitting the establishment of cemeteries only by non-profit religious organizations constitutes unreasonable classification and discriminates against non-profit, non-religious cemetery organizations.

On this appeal plaintiff first contends that Councilman Birrer was disqualified from participating either as a member of the planning board or as a member of the council because of his conflicting interests. Plaintiff also challenges Bender's participation as a member of the council for the same reason. The defendant borough denies that either councilman had a conflicting interest. In addition, the borough argues that in the enactment of the ordinances the councilmen were acting in a legislative capacity and thus a showing of actual bad faith or improper motivation is necessary to vitiate their actions.

The citizens of a community have a right to expect that a public official in the performance of his duty will exercise his best judgment unaffected by anything which will inure to his personal advantage. In order to secure complete impartiality in matters coming before a municipal planning board, the Legislature has prescribed that a member of such a board shall not be permitted to "act on any matter in which he has either directly or indirectly any personal or financial interest." *N. J. S. A.* 40:55–1.4. See *Zell v. Borough of Roseland,* 42 *N. J. Super.* 75 *(App. Div.* 1956). Members of the governing body, in their consideration of recommendations by the planning board, should not be permitted to act where a similar interest is present. The logic of this is cogently demonstrated by the facts of the present case. Birrer is a member of both the planning board and the borough council. An interest sufficient to disqualify him from acting on the planning board should equally work

a disqualification from his acting as a member of the borough council, at least when it is deliberating matters recommended by that body. The same reasoning applies to Councilman Bender. As a member of the borough council he was acting on the same matters that were dealt with and recommended by the planning board, and his actions must therefore be viewed in the light of the statutory provision. Therefore, the inquiry must be: Did Councilmen Birrer and Bender in participating in the adoption of these ordinances have directly or indirectly any personal or financial interest in the statutory sense?

The interest which it is alleged conflicts with Councilman Birrer's duty to impartially act on the ordinances in question arises from the following circumstances: (1) Councilman Birrer's younger brother, Robert Birrer, has since 1952 been employed as an accountant-bookkeeper by the Frank A. McBride Company. J. Nevins McBride is the executive vice-president of the Frank A. McBride Company and is also the president of Urban Farms, Inc., which held the contract to purchase part of the Archdiocese's property and intended to develop it. He is also a principal officer in Urban Planning Associates, which prepared and submitted the proposals, many of which culminated in the ordinances. He appeared several times before the planning board and borough council to urge the adoption of the Archdiocese's request. There is sufficient proof that Frank A. McBride Company, Urban Farms, Inc., and Urban Planning Associates were controlled by substantially the same persons and were affiliated at least to the extent of having a common interest in the proposal of the Archdiocese. We agree with the plaintiff that Councilman Birrer's brother was employed by a corporation which was interested in obtaining the passage of the challenged ordinances. Councilman Birrer did not attempt to hide the fact that his brother was a McBride employee. Indeed, he volunteered this information at a meeting of the planning board in August 1955. (2) In 1954 or 1955 Councilman Birrer engaged in a conversation with J. Nevins McBride concerning the possibility of locating

a golf course in the borough. It was indicated that among the possible locations for the course one might encompass the Birrer lands. During the August 1955 meeting of the planning board, Birrer voluntarily informed the members of the board of this conversation. (3) Councilman Birrer owns a 40-acre plot in the borough. It has a 210-foot frontage on Summit Avenue. A portion of the rear of the land is contiguous with a 300-acre quadrant owned by the Archdiocese. Somewhere within this quadrant the proposed cemetery is to be located. Ordinance 139 requires that:

"A buffer strip of land not less than two hundred and fifty (250) feet wide shall surround the land for which consent to or approval is given to locate and establish a cemetery, upon which land a street, not less than fifty (50) feet in width may be built on its periphery and fronting on the said street, residences may be built on plots of land in accordance with the requirements of the applicable residence zoning districts in the Zoning Ordinance of the Borough."

Plaintiff contends that the cemetery could be so located that a permitted street on the periphery of the buffer zone would materially benefit Birrer's land, in that it would provide a means of access to the rear portion of his property.

Does any one of the above allegations or all three in concert establish the personal interest requisite for the demanded disqualification?

As previously noted, the evidence establishes that Councilman Birrer's brother is employed as an accountant-bookkeeper for the McBride corporation, which is interested in the adoption of the ordinances. We are not faced with the situation where a councilman's employer is involved. Although this court has not expressly held that an employer-employee relationship in itself is sufficient to require disqualification, it has said in *Pyatt v. Mayor and Council of Borough of Dunellen,* 9 *N. J.* 548, 557 (1952) that "it is most doubtful that participation by a councilman in a municipal action of particular benefit to his employer can be proper in any case." See *Aldom v. Borough of Roseland,* 42 *N. J. Super.* 495 (*App. Div.* 1956); *Pressey v. Hills-*

*borough Tp.,* 37 *N. J. Super.* 486 (*App. Div.* 1955) and *Gland v. Mayor & Council of Borough of North Arlington,* 13 *N. J. Misc.* 521 (*Sup. Ct.* 1935). Nor are we faced with the situation where a member of the councilman's family is an interested party. However, it is obvious that a councilman should not participate in a municipal matter of this nature where he might be reasonably expected to favor or promote a relative's interest of a substantial character. Plaintiff contends that the fact that Councilman Birrer's brother is an employee of an interested party in itself places the councilman in a position where there is a conflict between his personal and public loyalties. We know of no case that has gone this far. The brother was employed by the McBride corporation long before this controversy arose. He is in the lower echelon of the personnel of a corporation that employs 700 persons. There is no evidence that his employment status will in any manner be enhanced by the passage of these ordinances.

The decision as to whether a particular interest is sufficient to disqualify is necessarily a factual one and depends upon the circumstances of the particular case. *Aldom v. Borough of Roseland, supra,* 42 *N. J. Super.* at *page* 503. No definitive test can be devised. The question will always be whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty. In *Wilson v. City of Long Branch,* 27 *N. J.* 360 (1958), the chairman of a planning board was also the president, a director and stockholder of a bank holding mortgages on properties in an area that the planning board recommended to the governing body to be deemed a blight area under *N. J. S. A.* 40:55–21.1 *et seq.* It also appeared that the mayor of the city, who voted for the blight resolution as a member of the governing body, was a director and stockholder of a bank which held mortgages in the area. This court held that these interests were too remote and contingent to bar the chairman and the mayor from performing their official duties.

Local governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official. If this were so, it would discourage capable men and women from holding public office. Of course, courts should scrutinize the circumstances with great care and should condemn anything which indicates the likelihood of corruption or favoritism. But in doing so they must also be mindful that to abrogate a municipal action at the suggestion that some remote and nebulous interest is present, would be to unjustifiably deprive a municipality in many important instances of the services of its duly elected or appointed officials. The determinations of municipal officials should not be approached with a general feeling of suspicion, for as Justice Holmes has said, "Universal distrust creates universal incompetency." *Graham v. United States*, 231 *U. S.* 474, 480, 34 *S. Ct.* 148, 151, 58 *L. Ed.* 319, 324 (1913); see also *Ward v. Scott (II)*, 16 *N. J.* 16 (1954). We recognize that certain circumstances, such as the existence of a substantial association, financial or otherwise, of an official's relative with an interested organization might constitute grounds for disqualification. And there may be other factors which would call for the official's withdrawal, *e. g.*, promotion of a relative in the event of favorable municipal action, or the relative's participation in the request for favorable municipal action. But none of these factors appears in the present case. Nothing more is shown than the bare fact that Councilman Birrer's brother was a subordinate employee of a corporation of the McBride enterprises. This circumstance is entirely too remote to be considered as tending improperly to influence the councilman's official judgment.

Plaintiff claims that the trial court committed error in sustaining defendant's objections to questions seeking to show that Urban Farms, Inc., Urban Planning Associates and the Frank A. McBride Company were essentially part of the same organization. Plaintiff further argues that the trial court abused its discretion in denying an adjournment in order that he might produce minutes of the planning board

which would substantiate this allegation. Assuming the trial court was in error on both rulings, our acceptance above of the plaintiff's contention that the three corporations were affiliated and essentially one negatives any prejudice which may have resulted.

Plaintiff's contention that a conflicting interest arose because of the conversation between Councilman Birrer and J. Nevins McBride concerning a golf course is without merit. The conversation was most vague and contained no definite proposals. Birrer had merely been asked if he would be interested in a golf course. We find nothing in this conversation that had in any fashion the slightest possibility of influencing Birrer's action.

We are also of the opinion that Councilman Birrer's ownership of property in the vicinity of the quadrant in which the Archdiocese tentatively proposes to establish a cemetery is not sufficient to warrant his disqualification. In relation to cemeteries, Ordinance 140 does no more than make them a permitted use in residential areas. Ordinance 139 regulates the manner in which cemeteries may be located and established. All applications for the location and establishment of a cemetery must be submitted to the governing body for approval. Neither ordinance fixes a particular location for a cemetery within a residential area. The location of the proposed cemetery of the Archdiocese has not been determined. The only indication respecting a location for the proposed cemetery is found in the plan submitted by Urban Planning Associates on behalf of the Archdiocese in its request for re-zoning. If we assume that the Archdiocese will locate its cemetery in the manner shown by its proposal, that in itself would be of no benefit to Councilman Birrer. The only benefit which he could derive from the establishment of a cemetery would be the creation of a public road on the periphery of the required buffer zone which would touch upon his property. The Archdiocese's proposal indicates no such road and Ordinance 139 merely permits and does not require the construction of a road upon the buffer area. Moreover, our study of the maps accom-

panying the Archdiocese's proposal discloses that the Birrer property is several hundred feet beyond the minimum of 250 feet required as the buffer area round the cemetery. That a cemetery will be established by the Archdiocese in such a location as to be of any benefit to Councilman Birrer is entirely too speculative and remote.

The plaintiff further contends that at the council meeting on April 22, 1957, when the ordinances were being considered, Councilman Birrer admitted a conflicting interest. We quote the pertinent part of the minutes which relate to this allegation:

"Mr. Steves (Councilman): I would like to give the proponents of this ordinance the opportunity first.

Mayor DeKorte: How can they discuss your statement?

Mr. Steves: I didn't mean for them to discuss my statement. I would like for them to make a statement for their reasons for downgrading.

Mr. Birrer: Obviously he would like me to talk first. It is perfectly all right.

Voice: How do you know who the proponents are, unless they have voted?

Mr. Birrer: I have offered the ordinance, and I have been known to favor one acre. I suppose people have said that I wouldn't even listen to reason.

I question that, and I question it seriously. I have attended as many sessions as I could possibly attend. I didn't miss any of the planning board meetings. I was here at all the public hearings. I attended Mr. Raymond's meeting the other night in the hopes that perhaps he had something a little bit more definite; and I still have heard nothing other than some purely selfish reasons, which I have to an extent myself.

We are all guilty of having some selfish reasons, but I feel that one acre zoning in this town is the best thing for our Borough."

■ We do not think that Councilman Birrer's words, uttered in the charged atmosphere of a public council meeting, show that he thought that he had any personal or financial interest in the passage of the ordinance. His remarks do not impugn his integrity but rather indicate that he had no secret thought of personal gain. Had he harbored any thought of venality it is most unlikely that he would have been as frank as he was in his statements.

These remarks were made in a general sense concerning the position of the members of the governing body on the issue of the reduction in area of the two-acre zone.

Plaintiff contends that Councilman Bender had a personal interest in the passage of the ordinances on the following grounds: (1) Bender's father under the will of John MacKenzie, his long-time employer, was given a life estate in a house, a mill and four acres of land, which property is situated in the new BB historical and cultural zone. This zone encompasses an area of about 15 acres. The senior Bender is 84 years old and has lived on the property for 60 years. He operates the mill to sharpen tools and to make cider for about two and a half months each year. The cider mill is about 55 years old and contains a wood lathe, unique because it is water-powered. Ordinance 140 provides that historical sites shall be preserved in the zone. Plaintiff contends that the ordinance contemplates that the cider mill as a historical site will be the nucleus of new business enterprises, with the result that the value of the life estate held by Councilman Bender's father will be enhanced. (2) A brother of Councilman Bender is a tenant on the Archdiocese's property. This tenancy commenced 30 years ago, long before the Archdiocese acquired the property.

We think that the interests of Councilman Bender's father and brother are too insubstantial to warrant his disqualification. The 84-year-old father has only a life estate in the property. On his death the remainder does not go to Councilman Bender or any member of his family. Any increase in the value of this life estate is highly speculative, at the most of slight worth, and unlikely of realization. The father's interest in the passage of these ordinances is too insignificant to warrant an assumption that it would in any manner influence Councilman Bender's vote. And the same is true as to the brother who has tenanted a house for 30 years on the Archdiocese's property.

We are of the opinion that the trial court properly found there was no evidence from which it could fairly be concluded that either Councilman Birrer or Bender had any

interest in the passage of the ordinances which would conflict with their official duties.

The plaintiff further urges that the trial court erred in refusing to grant an adjournment to allow the testimony of Councilman Hamlin. The proposed witness was not present in court during the day of the trial and the plaintiff sought an adjournment to the following morning so that the witness could be produced. The borough attorney objected on the ground that the witness' name had not been furnished to him in the plaintiff's answer to the following interrogatory:

"Set forth in full the names and addresses of all witnesses, including expert witnesses, who will testify in behalf of the plaintiff in this case."

"If the names of other are discovered, they will be submitted to the defendant at least 10 days prior to the date fixed for trial."

*R. R.* 4:23–12 provides:

"If the party furnishing answers to interrogatories shall obtain information subsequent to the pretrial conference which renders such answers incomplete, amended answers shall be served not later than 10 days prior to the day fixed for trial. Thereafter amendments may be allowed only for extraordinary or compelling reasons and to prevent manifest injustice, and upon such terms as the court may direct. In no case shall amendments be allowed at the trial where it appears that the evidence sought to be introduced was known to the party seeking such leave, more than 10 days prior to trial."

Plaintiff's trial counsel admitted that the evidence to be presented through Hamlin was known to him more than ten days prior to the trial. He did not indicate that he had subpoenaed the councilman or that he had otherwise attempted to secure the councilman's presence on the day of the trial. The trial court stated that he might consider relaxing the rule if counsel for the plaintiff could find a case showing he had discretion in the matter. Plaintiff's counsel made no attempt to offer authority and made no offer of proof. Plaintiff then rested and defendant moved for a dismissal of the case. During the ensuing arguments

on the motion, plaintiff was permitted to recall a witness and call another witness to the stand.

Plaintiff contends that the trial judge's refusal to permit Hamlin to testify was error and now desires that this court consider, in the form of an affidavit, the evidence which he sought to introduce through him. We have no doubt that in the interest of justice a showing of compelling circumstances will warrant a relaxation of *R. R.* 4:23–12. See *R. R.* 1:27A; *Abbatemarco v. Colton,* 31 *N. J. Super.* 181 (*App. Div.* 1954); *Barber v. Vaccaro,* 32 *N. J. Super.* 573 (*App. Div.* 1954). However, plaintiff does not attempt to excuse his failure to furnish his adversary with the witness' name, but rather contends now for the first time that the original interrogatory was improper and that, therefore, there was no need to amend it in order to include Hamlin's name as a witness. The impropriety of the original interrogatory cannot be denied. *R. R.* 4:23–9; *R. R.* 4:16–2; *Muir v. Anderson,* 14 *N. J. Super.* 231 (*Ch. Div.* 1951); *Schnitzer & Wildstein, N. J. Rules Service,* AIV–454–55. Plaintiff, however, neither moved to strike the interrogatory, *R. R.* 4:23–8, nor did he object to the same at the trial. His objection at that point was solely directed to the trial judge's failure to recognize that he had discretion to allow the witness to testify. Plaintiff's counsel was afforded an opportunity by the trial court to obtain a reconsideration of this ruling if he could furnish the court with authority. He did not avail himself of this opportunity. When plaintiff undertook to answer the interrogatory without objection, the defendant was entitled to rely on the information contained therein. The record shows that the defendant had in fact relied on plaintiff's answer, taking extensive depositions of all persons whose names were supplied. Plaintiff's objection to the interrogatory advanced for the first time in this court comes too late. Under the circumstances the trial court properly refused plaintiff's request for an adjournment.

Plaintiff also asks us to consider the deposition of Irving B. Dick, a member of the planning board. Mr. Dick was not called as a witness at the trial for the reason

that he was outside the State. Nor was his deposition offered in evidence by plaintiff, although the rule provides that under such circumstances it could have been introduced. *R. R.* 4:16–4(*c*). The plaintiff admits in his brief that "Nowhere in the official trial record does there appear a reason for not offering this deposition in evidence." In the absence of a compelling reason this court will not consider evidence which was available but not presented to the court below. *Morin v. Becker*, 6 *N. J.* 457, 460 (1951). Plaintiff's reliance upon *Devlin v. Surgent*, 18 *N. J.* 148 (1955), is unwarranted. That case involved a motion for summary judgment. In the present case the plaintiff has had his "day in court" and has had ample opportunity to present all of his evidence. We find no persuasive reason which would impel our consideration of the Dick deposition.

We are, however, cognizant of the public interest which surrounds a case in which the action of a municipal body is challenged, and in order to insure the protection of that interest, we have examined both Hamlin's affidavit and the Dick deposition and find nothing therein which would require us to disturb the trial court's disposition of the case.

The plaintiff's next ground of attack on Ordinance 140 was not set forth in the pretrial order but was developed without objection at the trial. He urges that section 2 of that ordinance must fall because it does not sufficiently identify all the lands which are encompassed within the AAA residential zone. That section provides:

"All lands above the North five hundred (500′) foot Contour Line or above the South five hundred (500′) foot Contour Line and having a grade exceeding eight (8%) per cent shall be in Residence A-A-A Districts.

The above-mentioned Contour Lines are set forth and established on the map accompanying this ordinance and made a part hereof."

Kenneth A. Broseman, chairman of the planning board, speculated that there might be a small area within these districts less than 8% in grade which would place them within the AA classification but that this determination would of necessity have to await a topographical survey.

Plaintiff asserts that as these areas cannot be readily ascertained from the ordinance or its accompanying map, this section of the ordinance is defective. We cannot agree. On its face the ordinance and the map accompanying it clearly delineate the boundaries of the triple A district. Plaintiff did not submit any evidence that in fact there were areas within these contour lines that had a grade of less than 8%. There is nothing in the record which would substantiate a finding that the standard employed by the borough to indicate the respective zones was in any manner inadequate.

Plaintiff further contends that Ordinance 140 is unconstitutional in that it authorizes only the establishment of cemeteries "when owned and operated by non-profit religious organizations," and thereby creates an arbitrary classification.

Although it is a rule of general acceptance that the constitutionality of a legislative act is open to attack only by a person whose rights would be infringed by its enforcement, *Koons v. Board of Com'rs of Atlantic City,* 134 *N. J. L.* 329, 338 (*Sup. Ct.* 1946), affirmed *per curiam,* 135 *N. J. L.* 204 (*E. & A.* 1947), we have recognized a broad right in taxpayers and citizens of a municipality to seek review of local legislative action without proof of unique financial detriment to them and, on that premise, to maintain an attack which goes to the validity of an entire district created under the zoning power. *Kozesnik v. Montgomery Township,* 24 *N. J.* 154, 177-78 (1957). We are, however, satisfied that the provision here assailed, if invalid, is severable from the remainder of the enactment and hence the claimed invalidity would not be fatal to the entire ordinance or district. In these circumstances we may but need not accept the issue. The treatment of the question in the briefs is most cursory, and the question not being necessarily involved because of severability, we are persuaded we should not decide it in this case. *Cf. Yanow v. Seven Oaks Park, Inc.,* 11 *N. J.* 341, 351 (1953). Since the oral argument we have been advised by counsel for the borough that it

has directed the preparation of an amendment which would delete the word "religious" from the ordinance. This additional circumstance lends further support to our decision to refrain from deciding the issue at this time.

The additional grounds upon which the plaintiff assails these ordinances are without substance. The judgment of dismissal entered in the Law Division is affirmed.

*For affirmance*—Chief Justice WEINTRAUB, and Justices HEHER, WACHENFELD, BURLING, JACOBS, FRANCIS and PROCTOR—7.

*For reversal*—None.