73 N.J. Super. 91 (1962)
179 A.2d 63
SEBASTIAN C. BRACEY, SAMUEL KLEIN AND HOWARD MARLIN, PLAINTIFFS,
v.
CITY OF LONG BRANCH, A MUNICIPAL CORPORATION OF THE STATE OF NEW JERSEY, PLANNING BOARD OF THE CITY OF LONG BRANCH, HOUSING AUTHORITY OF THE CITY OF LONG BRANCH, DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided March 8, 1962.
*93 Messrs. Parsons, Canzona, Blair and Warren, attorneys for plaintiffs (Mr. William R. Blair, Jr., appearing).
Mr. Louis R. Aikins, attorney for defendant City of Long Branch.
Mr. Jacob Rand, attorney for defendant Planning Board of the City of Long Branch.
Messrs. Juska and Fisher, attorneys for defendant Housing Authority of the City of Long Branch (Mr. Clarkson S. Fisher, appearing).
KNIGHT, A.J.S.C.
This suit in lieu of prerogative writs challenges the validity of an ordinance of the City of Long Branch entitled, "An Ordinance to Supplement and Amend an Ordinance Entitled `The Zoning Ordinance of the City of Long Branch' adopted May 31, 1955." The *94 amendatory ordinance was adopted June 6, 1961 and became effective June 14, 1961. The boundaries of the zones created are delineated on a map prepared by Otis R. Seaman, City Engineer, entitled, "Zoning Plan, Shrewsbury Riverfront Area" dated April 3, 1961. The area involved may be described as follows:
"Beginning at the intersection of the Shrewsbury River and Branchport Creek; thence eastwardly along the Shrewsbury River to the extension of Manhasset Avenue; thence eastwardly along Manhasset Avenue extended and Manhasset Avenue to Patten Avenue; thence westwardly along Patten Avenue to Florence Avenue; thence southwardly along Florence Avenue to Joline Avenue; thence westwardly along Joline Avenue to the westerly bank of Troutman's Creek; thence northwardly along the westerly bank of Troutman's Creek to Atlantic Avenue; thence westwardly along Atlantic Avenue to Branchport Creek and along Branchport Creek to the point and place of beginning."
On May 15, 1955 the governing body of the city adopted a resolution requesting the planning board to make a preliminary investigation and to hold a public hearing for the purpose of determining whether this area was "blighted." The board conducted preliminary investigations and held extensive public hearings, and thereafter, by resolution dated September 8, 1955, declared the area to be blighted. After receiving a copy of the report and resolution and reviewing the matter, the governing body approved the planning board's determination of blight on October 4, 1955. See Wilson v. Long Branch, 27 N.J. 360 (1958), where this determination was sustained.
N.J.S.A. 55:14A-1 et seq. empowers a local housing authority to prepare plans for the redevelopment of a blighted area and to undertake such redevelopment, provided the governing body approves the plan. The Long Branch Housing Authority prepared a plan for the redevelopment of the area, entitled "Urban Renewal Plan, Project N.J. R-20." On August 19, 1958 (after the Wilson decision rendered June 16, 1958) the board of commissioners approved the plan prepared by the housing authority, and on *95 March 17, 1959 directed the execution of a "Cooperation Agreement" between the city and the housing authority whereby the city agreed, among other things, "to amend the zoning map now in effect in the city to the extent that it will conform to the zoning plan included in the `Urban Renewal Plan.'" The ordinance under attack includes substantially all of the zoning recommendations made by the housing authority.
Plaintiffs are residents of the city and attack the ordinance on the following grounds: (1) certain members of the board of commissioners and the planning board had personal and conflicting interests in the adoption of the ordinance; and (2) adoption of the ordinance pursuant to the "Cooperation Agreement" between the city and the housing authority constituted an unlawful exercise of the zoning power.
Paul Kiernan, who was mayor of the city, and James W. Mancuso are alleged to have had such personal and conflicting interest in the adoption of the ordinance as would invalidate it. Kiernan, a member of the board of commissioners, as mayor, was an ex officio member of the planning board during the period those bodies considered the subject ordinance. Mancuso was appointed a member of the planning board on September 16, 1958, and holds that office presently. Pursuant to N.J.S.A. 40:55-35 the planning board considered the ordinance and recommended its adoption. As members of the planning board both Kiernan and Mancuso voted in favor of the recommendation. Subsequently, as a member of the board of commissioners, Kiernan voted for the adoption of the ordinance.
Plaintiffs contend Kiernan's disqualifying interest stems from the fact that his son was an employee of the housing authority at the time the ordinance was approved by the planning board and at the time it was adopted by the governing body. Mancuso performed architectural services for projects of the housing authority before and after his vote on the ordinance, and he was being considered by the *96 authority for such employment at the time of his vote. In addition, he worked on the urban renewal plan for the Shrewsbury Riverfront area as an "architectural consultant." This relationship between Mancuso and the housing authority is said to constitute a disqualifying interest.
The alleged disqualifying interests of Kiernan and Mancuso need only be evaluated with reference to their participation in the deliberations of the planning board, since the subsequent action of the board of commissioners will not cure a defect of this nature, if any, in the action of the planning board. Hochberg v. Borough of Freehold, 40 N.J. Super. 276, 283 (App. Div. 1956); Zell v. Borough of Roseland, 42 N.J. Super. 75, 82 (App. Div. 1956). While the self-interest of public officials in many areas of municipal action is evaluated in the light of common-law principles, planning board members are also subject to statutory control. N.J.S.A. 40:55-1.4 provides in part:
"No member of the planning board shall be permitted to act on any matter in which he has, either directly or indirectly, any personal or financial interest."
But the pertinent common-law principles are no less severe in their requirements, and the authorities in the area will accordingly be considered applicable here without distinction. See Aldom v. Borough of Roseland, 42 N.J. Super. 495, 503 (App. Div. 1956).
The public is entitled to have its representatives perform their duties free from any personal or pecuniary interest which might affect their judgment. "The law tolerates no mingling of self interest; it demands exclusive loyalty." Aldom v. Borough of Roseland, supra, at p. 500. The action of a public body may be vitiated by the action of one member of that body if he had a disqualifying personal or financial interest in the matter before it. Pyatt v. Mayor, etc., of Dunellen, 9 N.J. 548 (1952); Traction Co. v. Board of Works, 56 N.J.L. 431 (Sup. Ct. 1894), affirmed 57 N.J.L. 710 (E. & A. 1894). Whether the *97 interest alleged is sufficient to vitiate the action challenged depends upon the circumstances of the particular case.
"The question will always be whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty." Van Itallie v. Franklin Lakes, 28 N.J. 258, 268 (1958).
Consideration of some of the many factual situations ruled upon by our courts serves as a guide in evaluating the extent and effect of the alleged conflicting interests in the instant matter. In most cases the interest condemned involved a direct or indirect pecuniary or other benefit to the official himself or to a relative or employer. See Griggs v. Princeton Borough, 33 N.J. 207 (1960) (where a university was principal stockholder of a corporation which would benefit by a designation of a certain area as "blighted," said determination by the borough council was voided because two of the participating councilmen were professors of the university); Pyatt v. Mayor and Council of Dunellen, supra (zoning ordinances stricken where councilmen voting for their enactment were employees of a corporation substantially benefited thereby); Rankin v. Board of Education of Egg Harbor Tp., 135 N.J.L. 299 (E. & A. 1947) (set aside award of contract to sister-in-law of chairman of transportation committee of board of education); McNamara v. Saddle River Borough, 64 N.J. Super. 426 (App. Div. 1960) (restrictive zoning amendment voided where participating councilman had previously attempted to similarly restrict the affected entity through litigation); S. & L. Associates, Inc. v. Washington Tp., 61 N.J. Super. 312 (App. Div. 1960) (zoning amendment enhancing value of property owned by certain participating members of the governing body invalidated); Aldom v. Borough of Roseland, supra (zoning amendment voided where employer of councilman who voted for the amendment would be benefited by its enactment); Zell v. Borough of Roseland, supra (voided zoning amendment where member of planning board *98 who voted to approve the change was a communicant of a church which would be benefited thereby); Hochberg v. Borough of Freehold, supra (voided zoning amendment which would permit enlargement of a horse track at which a participating councilman operated a horsemen's kitchen); Ames v. Montclair, 97 N.J. Eq. 60 (Ch. 1925) (sale of board of education land to son of board member held unenforceable). But see Wilson v. Long Branch, supra; Van Itallie v. Franklin Lakes, supra; Calloway v. Wildwood Crest, 70 N.J. Super. 601 (Law Div. 1961). In Wilson the resolution of the governing body designating the Shrewsbury Riverfront area as "blighted" was held valid although two members of the planning board were officers in a financial institution which held mortgages on property within the area, and a third member was health officer of the city and resided about 300 feet from the area. In Van Itallie v. Franklin Lakes a councilman's brother held a "lower echelon" position in a corporation which would be benefited by a zoning amendment for which the councilman voted. This familial relationship was held not to constitute such an interest as would justify invalidation of the amendment. And in Calloway the action of a councilman in voting to approve the sale of public land was upheld, although the councilman's brother-in-law was a commission broker and represented the purchaser at the sale.
The alleged conflicting interest of Kiernan is similar to that said to exist in Van Itallie v. Franklin Lakes, supra. Kiernan's son had been a civil service employee of the housing authority for some time before the enactment of the ordinance and, furthermore, there is no proof that he could possibly benefit therefrom. Under the circumstances, Kiernan's interest must be held to be too remote to require invalidating the ordinance.
By contract dated April 20, 1954, Mancuso agreed to perform the following services for the housing authority relative to the Urban Renewal Plan for the Shrewsbury Riverfront area:
*99 "1. Prepare and submit Architectural Plans in accordance with a Redevelopment Plan to be prepared by others comprising the following elements:
(a) Residential, commercial, and public structures.
(b) Plan showing population, density, parking, and recreation facilities in accordance with redevelopment plan by others.
(c) A building layout plan for multi and single family uses.
(d) A typical floor plan showing distribution of units, room count, and cubeage sufficient to estimate overall cost.
(e) Typical elevation of one building and a rendered perspective of the entire project.
2. Prepare a narrative report describing architectural design and uses.
3. Consult with the Regional Office of the Federal Housing Administration for the purpose of approval of Architectural Plans for acceptability as the basis for mortgage insurance.
4. Consult with DSCUR as may be necessary.
5. Attend conferences as requested by the Local Public Agency during the term of contract."
His services were completed in January of 1956.
At trial Mancuso and the executive director of the housing authority, John E. Schulz, testified that Mancuso's work was in no way reflected in the urban renewal plan. It should be noted, however, that Mancuso is designated as the "architectural consultant" on the front plate of the pamphlet embodying the plan, and his name with the same designation appears on all of the maps contained therein.
On February 11, 1958 the housing authority authorized its chairman and executive director "to execute a contract with H. Irving Braun and James W. Mancuso, Associated Architects, for preparation of plans and specifications for Project N.J. 8-6," otherwise known as the Hobart Manor Senior Citizens Project. The contract was in fact executed on May 1, 1958, and the project was completed late in 1960. Mancuso received final payment for his services on March 27, 1961.
The proposed zone plan for the Shrewsbury Riverfront area was considered by the planning board prior to March 28, 1961. On that date a joint meeting of the planning board, the housing authority and the governing body was held. The meeting resulted from a suggestion by the executive *100 director of the housing authority that "the three boards could get together to iron out and listen to differences and any other changes the planning board might have. * * *" At the joint meeting the chairman asked for "new ideas of the members from any of the three boards on the Shrewsbury matter." In response, Mancuso began suggesting variations in the zone plan. A member of the planning board then challenged Mancuso's "eligibility to make recommendations and the like, since Mr. Mancuso had been the `architectural consultant' on the original Shrewsbury Urban Renewal Plan," and that he should disqualify himself. Mancuso parried the challenge and continued with his recommendations, stating that
"he felt the original plan as submitted was in his opinion very good. Since the [planning] board, however, felt there should be changes then this at least was a start."
After further discussion Mancuso then moved that the planning board "tentatively approve" the zoning amendments. Four zones were involved and Mancuso's motion as to each was carried.
The zoning ordinance concerning the riverfront area was formally referred to the planning board by the governing body on April 18, 1961. At a regular meeting of the planning board held April 27, 1961, the ordinance, as revised at the joint meeting of March 28, 1961, was ordered read. A motion to continue final action on the ordinance pending further study was deadlocked in a 4-4 vote, with Mancuso voting against the motion. At this time Mancuso's right to vote was again questioned by a member of the planning board. A motion to approve the ordinance was then made and carried by a 4-3 vote. Mancuso voted in the affirmative and one member abstained. After the ordinance was approved, Mancuso's right to vote was again challenged.
Apparently some confusion was created in the public mind by the board's action at the meeting of April 27. *101 As a result, a special meeting of the planning board was held May 1, 1961, at which time a motion to again approve the ordinance was carried by a 4-3 vote, with Mancuso voting in the affirmative. The ordinance was finally passed by the governing body on June 6, 1961, and became effective on June 14, 1961.
On June 13, 1961 the housing authority approved a contract for architectural services to be performed by H. Irving Braun and Mancuso, which was signed June 27, 1961. The services to be performed pertained to the Senior Citizens Housing Project to be located on Union Avenue. A motion to engage Braun and Mancuso had been favorably considered by the authority on June 14, 1960.
The relationship between Mancuso and the authority is revealed by the testimony of John E. Schulz, executive director of the housing authority.
"BY MR. RAND:
Q. Mr. Schulz, when you have a project in mind, do you submit the project to various architects in any area in the State or County for their examination before you call them in?
A. No, we do not.
Q. Well, what is the procedure used by the Housing Authority?
A. It is the policy of the Housing Authority to employ local professional people, if they are qualified and living within the city limits and who have established businesses there.
Q. All right. To your knowledge, will you list all of these local, qualified architects who have businesses within the city limits of Long Branch?
A.H. Irving Braun and James W. Mancuso.
Q. Are there any others?
A. Not to my knowledge.

* * * * * * * *
BY THE COURT:
Q. Has the Housing Authority of the City of Long Branch ever retained anyone as an architect other than Braun and Mancuso, or Braun, or Mancuso?
A. Yes, we have.
Q. And who was that?
A. Mr. Alexander MacIntosh and Mr. Godfrey Ricci.
Q. And when was that?
A. That was in 1939.
*102 Q. Since 1939 has the Housing Authority hired anyone other than Braun and Mancuso, or Braun, or Mancuso?
A. No."
The record clearly discloses the following: that prior to his vote Mancuso was the architectural consultant for the Shrewsbury Riverfront Urban Renewal Plan; that he performed architectural services for other housing authority projects; that he was being considered as an architect for another housing authority project at the time of his vote, and was subsequently retained as such; that he spearheaded planning board approval of the challenged ordinance; that favorable municipal motion on the riverfront project would virtually guarantee him, because of the authority's hiring policy, future architectural commitments from the authority in the project area itself; that as long as he did nothing which would stimulate a change in the authority's hiring policy, he was assured of similar commitments from the authority in any of its future projects. Hence, it must be inferred that favorable planning board action on the ordinance would operate to benefit Mancuso pecuniarily. Furthermore, even if the court were to assume there was no actual benefit, it is obvious that an opportunity for personal gain existed, and in the eyes of the law that is sufficient to constitute a disqualifying conflict-of-interest. Under the facts in this case the ordinance must be stricken.
Since the conflict-of-interest defect held to exist here may be easily remedied, see S. & L. Associates, Inc. v. Washington Tp., 35 N.J. 224 (1951); cf. N.J.S.A. 55:14B-7, the court will rule on the effect of the cooperation agreement on the amendatory ordinance. Cf. City of Clifton v. Zweir, 36 N.J. 309 (1962). That instrument obligates the city, inter alia:
"To amend the zoning map now in effect in the city to the extent that it will conform to the zoning plan included in the Urban Renewal Plan." *103 A cooperation agreement is a condition precedent to federal financial assistance, see 42 U.S.C.A. § 1415(7)(b); Passaic Jr. Chamber of Commerce v. Passaic Housing Auth., 45 N.J. Super. 381 (App. Div. 1957), and a municipality is expressly empowered to execute such agreements by virtue of N.J.S.A. 55:14B-4 which provides:
"For the purpose of aiding and cooperating in the planning, undertaking, construction or operation of housing or redevelopment projects located within the area in which it is authorized to act, any public body may upon such terms, with or without consideration, as it may determine:

* * * * * * * *
(d) Zoning. Plan or replan, zone or rezone any part of such public body; make exceptions from building regulations and ordinances and change its map;
(e) Agreements. Enter into agreements (which may extend over any period, notwithstanding any provision or rule of law to the contrary), with a housing authority or redevelopment agency or the Federal Government respecting action to be taken by such public body pursuant to any of the powers granted by this act. * * *"
Plaintiffs contend that the execution of a cooperation agreement absolute in its terms prevented the governing body from exercising its legislative discretion in wielding the zoning power and consequently the ordinance enacted pursuant to that agreement must be invalidated. The contention is said to find support in a line of cases, of which V.F. Zahodiakin Engineering Corp. v. Zoning Bd. of Adjustment, Summit, 8 N.J. 386 (1952), is one. There the following statement is found:
"Zoning is an exercise of the police power to serve the common good and general welfare. It is elementary that the legislative function may not be surrendered or curtailed by bargain or its exercise controlled by the considerations which enter into the law of contracts. The use restriction must needs have general application. The power may not be exerted to serve private interests merely, nor may the principle be subverted to that end." (8 N.J., at p. 394.)
This principle, while salutary within the area of its intended operation, does not apply here. A cooperation agreement *104 is not a substitute for the legislative action of the municipality. Passaic Jr. Chamber of Commerce v. Passaic Housing Auth., supra. While the exercise of ordinary municipal zoning power must be by ordinance, N.J.S.A. 40:55-30, amendatory zoning to accord with an urban renewal plan may be effected by resolution, N.J.S.A. 55:14B-7, and the final product need not fully accord with the requirements of the cooperation agreement. See Passaic Jr. Chamber of Commerce v. Passaic Housing Auth., supra, 45 N.J. Super., at pp. 390-391. When the legislation relating to cooperation agreements is read in pari materia with N.J.S.A. 40:55-30, prescribing the limits of municipal zoning power, the conclusion is inescapable that the legislative product conforming to such an agreement must be otherwise lawful. The inclusion of a clause in the agreement obligating the municipality to zone only "in so far as [it] may lawfully do so" (see Passaic Jr. Chamber of Commerce v. Passaic Housing Auth., supra, at p. 388) is consequently superfluous. Regardless of the presence or absence of such a clause in a cooperation agreement, an arbitrary or otherwise illegal exercise of the zoning power will not be condoned. In this case, if the amendatory ordinance had been legally adopted, the action taken by the city in accordance with the terms of the cooperation agreement would have been valid.
Judgment is entered in favor of the plaintiffs. Counsel will submit an appropriate order.