167 N.J. Super. 76 (1979)
400 A.2d 522
ELZER DROZDOW, HENRY FEIGENBAUM AND SAMUEL SCHWARZMAN, A PARTNERSHIP, PLAINTIFFS-RESPONDENTS,
v.
MAYOR AND CITY COUNCIL OF THE CITY OF VINELAND, A MUNICIPAL CORPORATION, HOUSING AUTHORITY OF THE CITY OF VINELAND, AND LEO DUNN, ZONING OFFICER OF THE CITY OF VINELAND, DEFENDANTS, AND MAYOR AND CITY COUNCIL OF THE CITY OF VINELAND, A MUNICIPAL CORPORATION, AND LEO DUNN, ZONING OFFICER OF THE CITY OF VINELAND, DEFENDANTS-APPELLANTS,
v.
RANDOLPH D. BRANDT AND JUDITH M. BRANDT, HIS WIFE, JOSEPH A. VASTANO AND PAULA T. VASTANO, HIS WIFE, CARL SOLE AND FRANCES SOLE, HIS WIFE, AND JAMES P. DAVIS AND JOAN L. DAVIS, HIS WIFE, DEFENDANTS-INTERVENORS.
Superior Court of New Jersey, Appellate Division.
Argued March 12, 1979.
Decided March 28, 1979.
*79 Before Judges CONFORD, PRESSLER and KING.
Mr. Michael E. Benson argued the cause for the appellants (Messrs. Tuso, Gruccio, Pepper, Buonadonna, Giovinazzi & Butler, attorneys; Mr. Anthony D. Buonadonna on the brief).
Mr. Stewart M. Hutt argued the cause for the respondents (Messrs. Hutt, Berkow, Hollander & Jankowski, attorneys; Mr. Norman Schulaner on the brief).
Mr. Joseph Adamo argued the cause for the Housing Authority of the City of Vineland (Messrs. Adamo and Pagluighi, attorneys).
*80 No appearance on behalf of the intervenors.
The opinion of the court was delivered by PRESSLER, J.A.D.
The Mayor and Council of the City of Vineland (city) and a group of taxpayer-intervenors appeal from a judgment of the Superior Court, Law Division, requiring the city to adopt a resolution pursuant to the Housing Cooperation Law which would afford the zoning relief necessary for the implementation of the three low-rent public housing projects sponsored by the city's housing authority. We affirm.
The essential facts are not in dispute. Vineland, with an area of some 69 square miles and a population of some 50,000, includes urban, suburban and rural areas and shares the problems characteristic of such areas of this State. In 1965 the city entered into a Cooperation Agreement with the Housing Authority pursuant to the Housing Cooperation Law, N.J.S.A. 55:14B-1 et seq., and more specifically N.J.S.A. 55:14B-4(e). The Cooperation Agreement included an undertaking by the city, insofar as it might lawfully so do, to "make such changes in any zoning of the site and surrounding territory of such Project as are reasonable and necessary for the development and protection of such Project and the surrounding territory." The Housing Cooperation Law, N.J.S.A. 55:14B-4(d), expressly authorizes the governing body to zone or rezone any part of the municipality in aid of a public housing project, and N.J.S.A. 55:14B-7 permits such implementing zoning or rezoning to be effected by simple resolution adopted by a majority of the governing body in lieu of the ordinance procedure otherwise required by N.J.S.A. 40:55D-62 (formerly N.J.S.A. 40:55-30 to 35). See Fischer v. Brick Tp., 109 N.J. Super. 50, 56 (App. Div. 1970), certif. den. 56 N.J. 98 (1970); Bracey v. Long Branch, 73 N.J. Super. 91, 104 (Law Div. 1962).
As part of its low-cost public housing program, the Housing Authority conceived a development plan for the construction of approximately 150 single-family homes under *81 a federal "turnkey" program whereby the homes would be built by private developers, who would then sell them at a predetermined price to the Housing Authority, which in turn would make them available to eligible families. It was the Housing Authority's further plan that these homes be built on scattered sites throughout the city, no site to contain more than 25 separate units. Accordingly, early in January 1975 it solicited conforming proposals by public advertisement and received 29 separate proposals. Eight of these proposals were submitted by plaintiffs, a partnership made up of three local builders. After reviewing the proposals the Housing Authority selected nine, five of which had been submitted by plaintiffs and all of which complied with the bulk requirements of the R-3 and R-4 residential zones in which the respective sites were located.[1]
Plaintiffs' five proposals were approved by the Housing Authority on October 1, 1975, and plaintiffs were instructed to and did proceed with the processing thereof in accordance with the requirements and procedures of the Housing Authority and the federal regulatory agency, namely, the Department of Housing and Urban Development (HUD). Simultaneously with these events the city decided to up-grade its bulk requirements for all of its residential zones. Ordinance 976, later somewhat modified, accomplishing that purpose was enacted in November 1975. As a result of that upgrading three of plaintiffs' five proposals were rendered nonconforming as to lot area and dimensions.[2] These three proposals are referred to as the Luciano Avenue site, the Di Falco Avenue site, and the Linwood Avenue site. The *82 first two are located in the R-3 residential zone and the last in the R-4 residential zone. These sites were projected to contain a total of 59 single-family homes distributed as follows: 25 on the Luciano Avenue site, 19 on the Di Falco Avenue site and 15 on the Linwood Avenue site.
The effect of the upgrading ordinance was to reduce the total of conforming lots to 43, eliminating 7 lots from the Luciano site, 6 from the Di Falco and 3 from the Linwood. These reductions were caused by an upgraded minimum lot requirement in both the R-3 and R-4 zones from 11,250 to 15,000 square feet. Additionally, the minimum lot depth in both zones was increased to 135 feet, that in R-3 having been 120 feet and in R-4 125 feet. Although the R-3 minimum lot frontage was restored to its original 75 feet, the R-4 frontage was increased from 75 to 100 feet. Additional bulk requirements were imposed in respect of corner lots in both zones. Both the R-3 and R-4 zones in the area of the sites in question are for the most part substantially developed, not only in terms of block, lot and street layout, but also in respect of actual residential use. That development substantially accorded with original bulk requirements. As a result of Ordinance 976 more than half of the improved lots and more than half of all lots in each of the subject sites and their surrounding areas were rendered nonconforming. In respect of the Di Falco site and its surrounding area, 72% of all the 316 lots therein contained are now nonconforming and 71% of all improved lots are now nonconforming. The proofs further show that many of the laid-out blocks in the R-3 zone are of insufficient width to accommodate 75 front-foot lots, back to back, which could conform with the upgraded area requirements.
Finally, with respect to the three projects here involved, the Housing Authority made routine inquiry of the agencies of the city providing police, sewerage, water and health services concerning any foreseeable development problems. The reports of these agencies were all to the effect that the projects could be successfully accommodated.
*83 Despite the undisputed need for low-cost housing, despite the fact that single-family low cost housing is obviously its least intrusive mode in the context of a single-family residential zone, despite the conformity of the proposed projects here with the developmental pattern of established neighborhoods, and despite the power of the city under the Housing Cooperation Law to except these projects from general application of its upgraded zoning scheme, the city, following a court-ordered hearing, nevertheless refused to accord the necessary zoning relief for these sites. Its basic position was that the total of 16 additional homes on the three sites which would result from such relief would substantially impair the integrity of its legitimate upgrading scheme.
The trial judge concluded that in view of the factual complex here recited, the city's refusal to cooperate, considered in light of the policy and provisions of the Housing Cooperation Law, was unreasonable. It was his finding, based on the record as a whole, that the panoply of reasons relied on by the city in its resolution denying zoning relief and addressed to such considerations as population density, stress on municipal services and adverse drainage and traffic consequences, did not justify its action. He was satisfied that these reasons were not factually supported and that the projects would not have an adverse impact on legitimate zoning desiderata substantial enough to justify jeopardizing them. These findings are amply supported by the record and we are in full agreement with them.
Municipalities of this State are accorded wide discretionary latitude in the exercise of the zoning power, and ordinarily, therefore, a municipal decision in respect of bulk limitations which is prima facie reasonable and rationally related to recognized zoning desiderata is immune from judicial interference. Cf. Pascack Ass'n, Ltd. v. Washington Tp., 74 N.J. 470, 483-485 (1977). That discretionary latitude is, however, subject to qualification, and one such qualification is the voluntary undertaking assumed by a municipality when it enters into a Cooperation *84 Agreement with another public agency pursuant to the Housing Cooperation Law.
We recognize that Housing Authority projects are subject to local zoning ordinances. N.J.S.A. 55:14A-11. Nevertheless, it is the expressed intention of the subsequently enacted Housing Cooperation Law, cited supra, that the municipal zoning power in respect of public housing be exercised flexibly and in a manner consistent with the objectives of that legislation. Those objectives, which are eloquently stated in N.J.S.A. 55:14B-2, are based upon the legislative perception that cooperative action by all levels of government is necessary in order to alleviate the critical shortage in this State of safe and sanitary housing affordable by low-income persons. See, generally, in respect of this State's commitment to the goal of providing adequate housing for all people, N.J.S.A. 55:14D-1 et seq. (Redevelopment Companies Law); N.J.S.A. 55:14E-1 et seq. (Urban Redevelopment Law); N.J.S.A. 55:14J-1 et seq. (New Jersey Housing Finance Agency Law of 1967); and N.J.S.A. 55:16-1 et seq. (Limited-Dividend Nonprofit Housing Corporations or Associations Law). And see Oakwood at Madison, Inc. v. Madison Tp., 72 N.J. 481 (1977); South Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151 (1975), cert. den. 423 U.S. 808, 96 S.Ct. 18, 46 L.Ed.2d 28 (1975); DeSimone v. Greater Englewood Housing Corp. No. 1, 56 N.J. 428 (1970).
We regard it appropriate, therefore, to consider the effect of the Cooperation Agreement on the municipal zoning discretion in light of the overriding public interest which is involved where governmentally sponsored and financed housing for low and moderate-income families is at stake. We do not believe that the municipality's contractual undertaking to zone in favor of the project is or should be construable as an abdication of the zoning discretion to the housing sponsor. See Passaic Jr. Chamber of Com. v. Passaic Housing Auth., 45 N.J. Super. 381 (App. Div. 1957). But that problem is not here involved. Here the municipal *85 undertaking was not simply to make whatever zoning changes would be necessary to accommodate the project, but rather, and properly so, to make only such changes which would be necessary and reasonable both for the development of the project and for the protection of the surrounding territory. We are satisfied that the use in the Agreement of the standard of reasonableness employed in conjunction with the desideratum of protection of surrounding territory results in a self-evident definition of the intended municipal obligation. That obligation, as we perceive it, was for the municipality to act favorably if the negative impact of the project on the surrounding territory would be not so adverse, if adverse at all, so as to result in substantial detriment to the public good or an impairment of the zone plan and zoning ordinance. That is, of course, the familiar standard defining the so-called negative criteria which must be met by an applicant for variance relief. N.J.S.A. 40:55D-70. We are persuaded that this was precisely the standard for favorable municipal action to which the city committed itself in the Cooperation Agreement.
Application of that standard might well present difficulty in those cases in which the operative factual complex might give rise to fair debate as to the extent of the violation of the zone plan which would be caused by according the required zoning relief. We perceive, however, no such difficulty here and need not, therefore, address the troublesome question of whose judgment on such debatable matters would ultimately prevail. Here, and patently so, there is no room for fair debate. The deviation from the plan and provision of the city's upgraded zoning ordinance which would result from permitting the additional 16 single-family dwellings in question is so obviously minimal as to negate the realistic probability of any functional impairment thereof at all. These housing projects will be jeopardized, if not lost, without that permission. Both the necessity for and reasonableness of the requested zoning relief, in terms both of the projects themselves and their surrounding areas, are manifest. *86 The city, as manifestly, acted unreasonably and arbitrarily in refusing to provide it.
Affirmed.
NOTES
[1] The only initial zoning incompatibility was the fact that two of the sites were located partially in a residential zone and partially in an industrial zone. The industrial zone portion was, however, subsequently rezoned residential.
[2] The upgrading ordinance did not apply to two of the sites since, having already been scheduled, they were protected by the ordinance's "grandfather clause."