896 A.2d 1111

IN THE MATTER OF JOHN F. ZISA, MAYOR,
CITY OF HACKENSACK, APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued February 1, 2006—Decided May 1, 2006.

Before Judges WEFING, FUENTES and GRAVES.

*William Harla* argued the cause for appellant (*DeCotiis, Fitz-patrick, Cole & Wisler,* attorneys; *Mr. Harla,* of counsel; *Thomas A. Abbate,* on the brief).

*Julie Cavanagh,* Deputy Attorney General, argued the cause for respondent *Local Finance Board, Department of Community Affairs* (*Zulima V. Farber,* Attorney General, attorney; *Michael J. Haas,* Assistant Attorney General, of counsel; *Ms. Cavanagh,* on the brief).

The opinion of the court was delivered by

WEFING, P.J.A.D.

John F. Zisa appeals from a Final Decision of the Local Finance Board that he had violated *N.J.S.A.* 40A:9–22.5(c) and (d) of the Local Government Ethics Law, *N.J.S.A.* 40A:9–22.1 to-.25, and fining him $200. After reviewing the record in light of the contentions advanced on appeal, we reverse.

The City of Hackensack operates under a council/manager form of government. The City Council consists of five members, who are elected at-large, every four years. The Council, by a public vote, selects one of its members to the post of mayor. Zisa was selected as mayor by the members of the Council in 1989 and continued in that position at the time pertinent to this appeal. As a municipal official, Zisa is subject to the provisions of the Local Government Ethics Law.

In Hackensack, the positions of councilman and mayor are part time, and Zisa, in addition to serving as mayor, also maintains an insurance agency. He is also the managing member of Underwood Properties, LLC, a real estate holding company.

A persistent issue confronting Hackensack in its efforts to revitalize and maintain its central business area is the provision of adequate parking. In February 2000, Hackensack contracted to buy property located at 295 State Street for use as a parking lot. The property suffered from environmental contamination, and the contract called for the City to be responsible for remediation, in addition to paying the purchase price of $600,000. In March 2000, the City Council passed Ordinance 5–2000, which authorized the issuance of bonds in an amount sufficient to purchase the property located at 295 State Street, conduct the necessary remediation and convert it into a municipal parking lot. The City took title to the lot in May 2000. Zisa, as the mayor, participated in the discussion and voting on this question. No issue is raised before us as to the propriety of his actions in that regard.

After the City closed on its purchase of 295 State Street, Zisa negotiated the purchase of property located at 295 Main Street.[1] On June 28, 2000, he executed a contract to buy this property. Before taking title, he engaged in negotiations with the Bergen

---

[1] Zisa's transactions with regard to 295 Main Street were conducted through Underwood Properties. Throughout these proceedings, the parties have referred to Zisa, without regard to Underwood; for purposes of this opinion, we follow that practice.

County Special Services School District to lease space to the District in the building at 295 Main Street.

The District required, as a condition of entering such a lease, that it have the use of sixty-five parking spaces. The District did not require that those spaces be in a paved lot but did require that they be in close proximity to 295 Main Street.

Zisa knew that 295 Main Street only had twenty parking spaces available to its tenants. Hackensack had previously adopted an ordinance permitting the City to rent spaces in municipal parking lots to private parties in accordance with a specified fee schedule. On August 22, 2000, Zisa's personal attorney wrote to Hackensack's City Manager and inquired about the possibility of renting forty-five parking slots in the municipal parking lot due to be constructed at 295 State Street. Under the City's ordinance, the fee for such a rental would be $55 per month per space, and the City agreed to rent forty-five spaces to Zisa in the as-yet unbuilt parking lot at 295 State Street. Zisa received no special consideration or terms in connection with that agreement.

Once Zisa was assured that he would able to provide the necessary parking to the District, he closed on his purchase of the property at 295 Main Street. He also was able to arrange to rent for the District forty-five parking spaces at another nearby unpaved municipal lot until the work necessary to transform the empty lot located at 295 State Street into a paved municipal parking lot was completed. These spaces also rented for $55 per month per space. Zisa and the District executed a five-year lease for 295 Main Street on September 27, 2000.

Again, no issue is raised before us as to the propriety of Zisa's purchase of this building, his rental of the forty-five parking spaces at 295 State Street or his securing of the forty-five temporary spaces.[2]

---

[2] We note for the sake of completeness that those issues were presented to the Local Finance Board, which found no impropriety on Zisa's part.

In the interim, while Zisa was finalizing the details of his purchase and lease of 295 Main Street, the City solicited bids for the paving of 295 State Street. Only one company, F & F Occhipinti Co., Inc., submitted a bid, which was opened on October 23, 2000. Its bid was in the amount of $225,325 and was within budget. It was forwarded to the City Engineer, Kenneth Job, for review, and he recommended the City award the contract to Occhipinti. In a letter to the City Manager, Mr. Job recommended against re-advertising the job, stating it did "not appear likely that the City would obtain a significantly lower price by re-advertising and re-bidding."

The question whether to accept Occhipinti's bid and award it the contract was placed upon the agenda for the Council's regularly scheduled meeting for November 1, 2000. The agenda was circulated one day in advance of the meeting. After reviewing the agenda, Zisa contacted the City Attorney, Richard Salkin, Esq., and inquired whether he had a conflict of interest that would preclude him from voting on whether Occhipinti should be awarded the paving contract. Salkin was aware that Zisa had purchased the property at 295 Main Street and had leased forty-five parking spaces in the lot to be built at 295 State Street for the use of Zisa's tenant in 295 Main Street. Salkin said he would review this statute and consider the matter. Later that day, Salkin called Zisa and told Zisa that, in his opinion, Zisa did not have such a conflict of interest.

Four members of the Council, including Zisa, were present for the November 1, 2000, meeting. The Council, by a vote of four to nothing, adopted a resolution awarding the contract to Occhipinti. Zisa was the last to vote; by the time he cast his vote, the three other members had already voted in favor of the resolution. The Council also passed a series of subsequent resolutions approving progress payments to Occhipinti for its paving work. Zisa participated in these votes as well.

In December 2002, the Local Finance Board received a complaint from Hackensack Taxpayers Association, Inc. that Zisa had

violated certain portions of the Local Government Ethics Law through his participation in the City's decision to purchase 295 State Street, his subsequent purchase of 295 Main Street, and his leasing of the forty-five parking spaces in the lot at 295 State Street. The Local Finance Board conducted a preliminary investigation and in July 2003 concluded that Zisa had acted properly when he participated in the City's decision to purchase 295 State Street, when he purchased 295 Main Street and when he leased forty-five parking spaces from the City in the lot at 295 State Street. It also concluded, however, that a sufficient basis existed to warrant authorizing an investigation into Zisa's participation in the vote of November 1, 2000, awarding the paving contract to Occhipinti, in light of the fact that he had leased spaces in the 295 State Street lot for the benefit of his tenants.

Thereafter, in March 2004, the Local Finance Board issued a Notice of Violation, setting forth its determination that Zisa, by voting on the November 1 resolution, violated *N.J.S.A.* 40A:9–22.5(c) and (d). Zisa requested that the matter be forwarded to the Office of Administrative Law, which conducted a plenary hearing. The witnesses at this hearing were David Nenno, a staff member of the Local Finance Board who participated in the Board's investigation, Zisa, and Salkin. The administrative law judge issued a written decision affirming the conclusion of the Local Finance Board. After Zisa submitted exceptions to that decision, the Local Finance Board issued a written decision in which it adopted the decision of the administrative law judge as the final agency decision. Zisa's appeal to this court followed.

Before proceeding to a detailed analysis of the issues presented, we acknowledge that this is an appeal from a final decision of an administrative body. The general standard of review governing such appeals is well-known and oft-stated; such a final decision should not be disturbed on appeal unless it is arbitrary, capricious or unreasonable. *Karins v. City of Atlantic City,* 152 *N.J.* 532, 540, 706 *A.*2d 706 (1998). An appellate court should undertake a "careful and principled consideration of the agency record and

findings." *Riverside Gen. Hosp. v. N.J. Hosp. Rate Setting Comm'n*, 98 *N.J.* 458, 468, 487 *A.2d* 714 (1985). The agency's findings should be affirmed if they "could reasonably have been reached on sufficient credible evidence present in the record, considering the proofs as a whole ... with due regard also to the agency's expertise." *Close v. Kordulak Bros.*, 44 *N.J.* 589, 599, 210 *A.2d* 753 (1965) (quotation marks and citation omitted).

A different standard is applicable, however, when a court is called upon to review the legal conclusions of an administrative body. In that instance, a reviewing court is not bound by an agency's determination of a legal issue. *Greenwood v. State Police Training Ctr.*, 127 *N.J.* 500, 513, 606 *A.2d* 336 (1992); *AC&C Dogs, LLC v. N.J. Dep't of Labor*, 332 *N.J.Super.* 330, 335, 753 *A.2d* 737 (App.Div.2000) (noting that the limited scope of judicial review of an administrative decision is "generally confined to review of questions of fact, as opposed to questions of law"). Here, there were no real disputed questions of fact. The determination that Zisa's actions represented a violation of the Local Government Ethics Law was a legal conclusion by the Board to which no special deference is due by a reviewing court.

By its decision, the Board concluded that Zisa's conduct violated two separate sections of the Local Government Ethics Law. A separate analysis is required for each section at issue.

*N.J.S.A.* 40A:9–22.5(c) provides:

No local government officer or employee shall use or attempt to use his official position to secure unwarranted privileges or advantages for himself or others[.]

■ The administrative law judge, whose opinion the Board adopted, held that Zisa's vote on November 1, 2000, violated this subsection because the expenditure of public funds authorized by the resolution "secured the advantage of improving the parking for the respondent's tenant." There is nothing in the record, however, to show that the District required that its parking spaces be paved. While it is reasonable to conclude that a paved parking lot is better than an unpaved one, there was no advantage to Zisa in having the lot paved for his tenant.

■ The statute, moreover, bars a municipal official from using his position to secure an "unwarranted" privilege or advantage. An unwarranted privilege or advantage would be one that is unjustified or unauthorized, one that would permit the municipal official to obtain something otherwise not available to the public at large.

Zisa, however, leased the forty-five spaces in the 295 State Street lot on the same terms and conditions available to any member of the public. He did not obtain or seek a lesser rate or preferential terms of payment, nor did he "bump" a member of the public and secure these parking places before a member of the public who was seeking to rent parking space.

From our review of the record, we consider it clear that Zisa obtained nothing as a result of the November 1, 2000, vote that could fairly be characterized as an "unwarranted" privilege or advantage. The determination that Zisa violated *N.J.S.A.* 40A:9–22.5(c) is not supported by the record.

■ We turn now to the Board's determination that Zisa violated subsection (d) of the statute, which provides:

No local government officer or employee shall act in his official capacity in any matter where he, a member of his immediate family, or a business organization in which he has an interest, has a direct or indirect financial or personal involvement that might reasonably be expected to impair his objectivity or independence of judgment[.]

[*N.J.S.A.* 40A:9–22.5(d).]

The Board adopted the conclusion of the administrative law judge that the nature of Zisa's interest in the outcome of the vote on the November 1, 2000, resolution could "reasonably be expected to impair his objectivity or independence of judgment." In our judgment, based on the record created, this analysis is incorrect. The question on which the council voted on November 1 was whether Occhipinti was qualified and should receive the contract to pave 295 State Street. The entity that had an interest in the outcome of the November 1, 2000, vote was the bidder, Occhipinti, and Zisa had no interest or connection with Occhipinti.

■ Further, we disagree with the Board's rejection of the defense proffered by Zisa, that he relied upon the advice of counsel. The administrative law judge concluded that it was not reasonable for Zisa to have relied upon the advice of the City Attorney in light of his interest in the development of the parking lot. While we agree with the Board that the advice of counsel is not an absolute defense to a charge of having violated the Local Government Ethics Law, we also agree with Zisa that he was entitled to the protection of that defense in the context of this case.

The administrative law judge concluded that it was not reasonable for Zisa to have relied upon the advice given to him by Salkin. He gave no reasons, however, to support that conclusion. The Board, in adopting the decision of the administrative law judge, also concluded that Zisa was not reasonable in relying upon Salkin's advice that he did not have a conflict of interest that precluded him from voting on the resolution to award the paving contract to Occhipinti. In support of its conclusion, the Board cited the following three factors: that the minutes of the November 1 meeting did not contain any notation that Salkin had advised Zisa he could vote; that Salkin had not provided a written opinion on the question; and that Zisa is an "experienced and astute public official."

We are satisfied that these factors, either singly or in combination, are not sufficient to defeat the defense of advice of counsel. As to the first, we are uncertain of its relevance in the context of this case. Neither the administrative law judge nor the Board expressed any doubt that Zisa had in fact asked Salkin for his advice on the issue, nor did they view the testimony of either man as lacking credibility in any way.

As to the second, there was no evidence that the usual practice among municipal attorneys would be to provide a written opinion in response to such a query. There is also no indication of a dispute about the advice that was given. Absent either of those two factors, we do not perceive support for the conclusion that

Zisa was not entitled to rely upon Salkin's advice because it was given orally, as opposed to in writing.

We also do not perceive the significance of Zisa being an experienced public official in the context of this case. The administrative law judge noted that he considered it significant that Zisa "evidenced sensitivity to the issue of a potential conflict" of interest but did not explain why, having been sensitive to the question and sought legal advice, Zisa was not entitled to rely upon the advice that he received.

We consider instructive the approach adopted in *In re Howard*, 93 *N.J.A.R.*2d (Vol.5A) 1 (Executive Comm'n on Ethical Standards), *aff'd as modified*, 94 *N.J.A.R.*2d (Vol.5A) 1 (App.Div.1994). The respondent in that matter, who was employed in the Department of Corrections, was charged with violating subsections (6) and (7) of the code of ethics for state employees, *N.J.S.A.* 52:13D–23(e), for accepting a round trip private jet flight from New Jersey to Florida, together with ground transportation, to view the manufacturing facilities of a company holding a contract with the Department. *Howard, supra*, 93 *N.J.A.R.*2d at 1–2. The respondent asserted in defense that she had received prior approval to accept the contractor's offer from an individual who was both a legal advisor to the Commissioner of Corrections and a member of the department's Ethics Committee. *Id.* at 3, 7, 14.

The Executive Commission on Ethical Standards rejected that defense, finding there were four prerequisites to the defense and that respondent failed to meet all of them. *Id.* at 14. The four prerequisites were:

1. That the approval or advice was received prior to the action being taken. *Ibid.* Here, Zisa sought and received legal advice before casting his vote.

2. That the individual who offered the advice or approval relied upon possessed authority or responsibility with regard to ethical issues. *Ibid.* Here, Salkin, as the City Attorney, had a responsi-

bility to render advice with regard to the Local Government Ethics Law.

3. That the individual seeking advice or approval made a full disclosure of all pertinent facts and circumstances. *Ibid.* Here, Salkin was fully cognizant of the details of Zisa's involvement with 295 Main Street and his leasing of parking spaces in 295 State Street.

4. That the individual comply with the advice received, including any restrictions it might contain. *Ibid.* Here, Salkin's advice contained no limiting restrictions.

In *Howard,* it was the respondent's failure to meet the third condition that led the Commission to conclude that she violated the code of ethics despite having received prior approval. *Id.* at 14–15. It noted, in particular, that respondent had failed to disclose all the details of the trip, failed to disclose that the contractor had an interest in expanding its business with the Department and that respondent would play a role in deciding whether the contractor would be successful in that regard, and failed to disclose that she had been earlier advised by another member of the Department's Ethics Committee that a similar trip to Michigan could not be approved. *Ibid.* Here, as we have noted, Zisa withheld nothing from Salkin.

Zisa having met all the conditions to warrant the defense of advice of counsel, and the record containing nothing to support a determination that it was unreasonable to rely upon the advice, we reverse the decision of the Board that Zisa violated the Local Government Ethics Law.

Reversed.