NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NOS.  A-4482-16T4
                          A-4504-16T4

JOANN MONDSINI,

      Petitioner-Appellant,

v.

LOCAL FINANCE BOARD,

      Respondent-Respondent.

_____

ROCKAWAY VALLEY REGIONAL
SEWERAGE AUTHORITY,

      Intervenor-Appellant.

_____

APPROVED FOR PUBLICATION

March 5, 2019

APPELLATE DIVISION

Argued December 17, 2018 – Decided March 5, 2019

Before Judges Messano, Gooden Brown and Rose.

On appeal from the New Jersey Department of
Community Affairs, Local Finance Board, Complaint
#13-038.

Richard A. Gantner argued the cause for appellant
(Cleary Giacobbe Alfieri Jacobs, LLC, attorneys;
Richard A. Gantner, on the briefs).

Stephen E. Trimboli argued the cause for intervenor-
appellant (Trimboli & Prusinowski, LLC, attorneys;

Stephen E. Trimboli, of counsel and on the briefs; Lauren W. Kavanagh, on the briefs).

Dominic L. Giova, Deputy Attorney General, argued the cause for respondent (Gurbir S. Grewal, Attorney General, attorney; Melissa Dutton Schaffer, Assistant Attorney General, of counsel; Melanie R. Walter, Deputy Attorney General, on the brief).

The opinion of the court was delivered by

MESSANO, P.J.A.D.

JoAnn Mondsini became the Executive Director of the Rockaway Valley Regional Sewerage Authority (the Authority) in September 2012. Within weeks, Mondsini faced a natural disaster of epic proportions, Super Storm Sandy, which struck New Jersey on October 29, causing catastrophic damage to homes, businesses and the State's infrastructure. The Authority lost electrical power during the storm and maintained operations by using diesel generators. If the generators failed, millions of gallons of untreated sewage would discharge into the Rockaway River. The situation grew critical as the Authority anticipated it would run out of diesel fuel by November 2.

Certain Authority employees were essential to keep the generators operating. Because of a statewide gasoline shortage, these employees were unable to fuel their personal vehicles to drive to and from work. Mondsini authorized several employees to fuel their personal vehicles from an Authority gasoline pump. She contacted the Regional Operations Intelligence Center, a

statewide emergency management consortium, and advised of the critical situation the Authority faced.

Bruce MacNeal was a member of the Authority's Board of Commissioners and served as board secretary. As such, he was an employee of the Authority and was authorized to sign the Authority's checks. On November 2, MacNeal, who often came to the Authority to sign checks and otherwise keep abreast of its activities, arrived and offered his assistance to Mondsini. She had MacNeal sign two checks in anticipation of a diesel oil delivery later that day. She also asked if he could "commandeer a gas station" in Boonton, where MacNeal lived, to supply gas to the Authority's essential personnel, and obtain food from restaurants that might be open to feed Authority personnel on site.

While discussing the gasoline shortage, MacNeal said he needed to find gasoline himself. Mondsini authorized MacNeal to fuel his personal vehicle from the Authority's pump. Unbeknownst to Mondsini, MacNeal fueled two personal vehicles with the Authority's gasoline. Mondsini advised the Board of her actions regarding the crisis at its next meeting on Thursday, November 8.

An unknown informant complained to law enforcement authorities about Authority employees using agency gasoline for personal use during the storm.

The report was referred to the Local Finance Board (LFB). After investigation, the LFB found Mondsini violated N.J.S.A. 40A:9-22.5(c) (subsection (c)), a provision of the Local Government Ethics Law (LGEL), N.J.S.A. 40A:9-22.1 to -22.25, which provides: "No local government officer or employee shall use or attempt to use his official position to secure unwarranted privileges or advantages for himself or others." The LFB assessed a $100 fine against Mondsini, which it simultaneously waived.[1]

Mondsini appealed, and the matter was transferred to the Office of Administrative Law as a contested case. The Authority intervened in support of Mondsini. After denying the LFB's motion for summary decision, the Administrative Law Judge (ALJ) conducted a hearing and rendered an initial decision.

Among other things, the ALJ found Mondsini to be a credible witness and concluded she had not violated the LGEL.[2] He reasoned that a violation of subsection (c) "requires a showing of intent." The ALJ also rejected the LFB's contention that Mondsini secured an "unwarranted" privilege for MacNeal because he was not an "essential employee" and obtained gasoline that was unavailable to the public. Finding Mondsini's "sole intent was to keep the

[1] The LFB also filed a violation against MacNeal and fined him $200.

[2] Our summary of the facts is based on the ALJ's findings of fact.

plant up and running" during the crisis, the ALJ concluded she "acted prudently. To permit the LFB to use hindsight to say this was a violation of the [LGEL] would have local government officials afraid to perform their jobs."

In its final agency decision, the LFB accepted the ALJ's findings of fact, with only one modification, i.e., the ALJ's assessment that the testimony of the LFB's investigator was less than credible. The LFB, however, rejected the ALJ's legal conclusions, asserting subsection (c) does not "require[] a showing of intent." In addition, the LFB rejected the ALJ's suggestion that the LGEL includes a "crisis exception." The LFB reinstated the violation and penalty, but once again waived its enforcement.

We consolidated the appeals filed by Mondsini (A-4482-16), and the Authority, which intervened before the LFB (A-4504-16), to issue a single opinion. Mondsini argues subsection (c) requires proof of "specific intent" to violate its provisions, and she never acted to "secure unwarranted privileges or advantages" for MacNeal. The Authority reiterates these arguments and further contends that the LFB erred by concluding MacNeal was not an essential employee of the Authority, duly authorized under the Sewerage Authorities Law, N.J.S.A. 40:14A-1 to -45, to perform certain functions. It

also argues the LFB lacked jurisdiction in this matter pursuant to N.J.S.A. 40:14A-35.

I.

We begin by noting "[j]udicial review of agency determinations is limited." Allstars Auto Grp., Inc. v. N.J. Motor Vehicle Comm'n, 234 N.J. 150, 157 (2018) (citing Russo v. Bd. of Trs., Police and Firemen's Ret. Sys., 206 N.J. 14, 27 (2011)). "An administrative agency's final quasi-judicial decision will be sustained unless there is a clear showing that it is arbitrary, capricious, or unreasonable, or that it lacks fair support in the record." In re Herrmann, 192 N.J. 19, 27-28 (2007) (citing Campbell v. Dep't of Civil Serv., 39 N.J. 556, 562 (1963)). "A reviewing court 'must be mindful of, and deferential to, the agency's expertise and superior knowledge of a particular field.'" Allstars Auto Grp., 234 N.J. at 158 (quoting Circus Liquors, Inc. v. Governing Body of Middletown Twp., 199 N.J. 1, 10 (2009)).

Nevertheless, "because 'questions of law are the province of the judicial branch,' we are 'in no way bound by an agency's interpretation of a statute or its determination of a strictly legal issue,' particularly when 'that interpretation is inaccurate or contrary to legislative objectives[.]'" Russo, 206 N.J. at 27 (citations omitted). Similarly, "if the agency interpretation of a statute is plainly at odds with the plain meaning of the statute, the agency interpretation

will be set aside." Oberhand v. Dir., Div. of Taxation, 193 N.J. 558, 568 (2008).

Because these appeals present a question of statutory interpretation, "we strive to effectuate the Legislature's intent." Finkelman v. Nat'l Football League, ___ N.J. ___, ___ (2019) (slip op at 11) (citing Cashin v. Bello, 223 N.J. 328, 335 (2015); DiProspero v. Penn, 183 N.J. 477, 492 (2005)). "[T]he best indicator of that intent is the statutory language." DiProspero, 183 N.J. at 492 (citing Frugis v. Bracigliano, 177 N.J. 250, 280 (2003)). "If the plain language leads to a clear and unambiguous result, then [the] interpretative process is over." Johnson v. Roselle EZ Quick LLC, 226 N.J. 370, 386 (2016) (quoting Richardson v. Bd. of Trs., Police and Firemen's Ret. Sys., 192 N.J. 189, 195 (2007)). "We construe the statutory language 'in context with related provisions so as to give sense to the legislation as a whole.'" Finkelman, ___ N.J. ___ (slip op. at 11) (quoting Spade v. Select Comfort Corp., 232 N.J. 504, 515 (2018)).

## II.

Before turning to the specific language of the LGEL, we recognize its "objective is to make ethical standards in state and local government 'clear, consistent, uniform in their application, and enforceable on a statewide basis.'" Grabowsky v. Twp. of Montclair, 221 N.J. 536, 552 (2015) (quoting

Wyzykowski v. Rizas, 132 N.J. 509, 531 (1993)). "Noting that '[w]henever the public perceives a conflict between the private interests and the public duties of a government officer or employee,' the public's confidence in the integrity of government is 'imperiled,' the Legislature recognized the need for standards by which it may be determined 'whether public duties are being faithfully performed.'" Id. at 553 (alteration in original) (quoting N.J.S.A. 40A:9-22.2(c)-(d)); see also Wyzykowski, 132 N.J. at 536 (Clifford, J., concurring in part, dissenting in part) (noting the Legislature enacted the LGEL "to codify a set of guidelines designed to limit actions by local officials that might create doubt in the minds of citizens concerning the motivations of those officials"). The LGEL "demands that an officeholder discharge duties with undivided loyalty." Macdougall v. Weichert, 144 N.J. 380, 401 (1996). Nevertheless, "[t]here cannot be a conflict of interest where there do not exist, realistically, contradictory desires tugging the official in opposite directions.'" Wyzykowski, 132 N.J. at 524 (alteration in original) (quoting LaRue v. Twp. of East Brunswick, 68 N.J. Super. 435, 448 (App. Div. 1961)).

The facts in Wyzykowski predated enactment of the LGEL, but the Court there directed that "[f]uture decisions should be consistent with the principles of [the LGEL]." Id. at 530. Still, Wyzykowski's analytical paradigm continues to influence our decisions. See, e.g., Grabowsky, 221 N.J.

at 552-55; Thompson v. City of Atlantic City, 190 N.J. 359, 375 (2007) (noting "common law conflict-of-interest doctrine" as explained in Wyzykowski and other cases are "supplemented by the [LGEL]").

"In furtherance of [the LGEL's] purposes, the Legislature adopted a statutory code of ethics, N.J.S.A. 40A:9-22.5 . . . ." Dep't of Cmty. Affairs, Local Fin. Bd. v. Cook, 282 N.J. Super. 207, 209 (App. Div. 1995). This code of ethics prohibits local government officers and employees from engaging in seven specific forms of conduct. See N.J.S.A. 40A:9-22.5(a) and -22.5 (c) to (h). The Legislature granted the LFB "jurisdiction to govern and guide the conduct of local government officers or employees regarding violations of the provisions of th[e] [LGEL] who are not otherwise regulated by a county or municipal code of ethics . . . ." N.J.S.A. 40A:9-22.4; see also N.J.S.A. 40A:9-22.7 (enumerating the powers given to the LFB to implement the LGEL).

In this case, we must construe subsection (c), which, recall, prohibits a local government officer or employee from "us[ing] or attempt[ing] to use his official position to secure unwarranted privileges or advantages for himself or others." N.J.S.A. 40A:9-22.5(c). Mondsini and the Authority both contend that the statute requires a showing that the use or attempted use of one's public position be for the specific purpose of securing an "unwarranted" privilege or advantage for the officer or some other person.

The LFB asserts to the contrary that no specific intent is required, but rather only that the officer's actions create the potential for the public's perception of impropriety. The LFB argues that since it is undisputed Mondsini permitted MacNeal to use the Authority's gasoline, her intention in doing so was irrelevant. Moreover, since the gasoline was unavailable to the public at large, Mondsini bestowed an "unwarranted privilege" on MacNeal.

Undoubtedly, the Legislature's recognition of the importance of public perception finds voice in the operative language of certain subsections of the LGEL's code of ethics. As the ALJ noted, for example, subsection (d) prohibits an official from acting "in his official capacity in any matter where he . . . or a business organization in which he has an interest, has a direct or indirect financial or personal involvement <u>that might reasonably be expected to impair his objectivity or independence of judgment</u>[.]" N.J.S.A. 40A:9-22.5(d) (emphasis added); <u>cf.</u> <u>Kane Props., LLC v. City of Hoboken</u>, 214 N.J. 199, 221-22 (2013) (defining general ethical standard for assessing municipal attorney's conduct as engendering an "objectively reasonable" doubt about the integrity of the proceedings). Likewise, in subsection (e), the Legislature prohibited local government officials and employees from "undertak[ing] any employment or service, whether compensated or not, <u>which might reasonably</u>

be expected to prejudice his independence of judgment in the exercise of his official duties[.]" N.J.S.A. 40A:9-22.5(e) (emphasis added).

Much of the case law spawned by the LGEL deals with application of these subsections, or similar common law principles enunciated prior to passage of the LGEL, to specific facts, where the critical issue was whether the public officer or employee was in an actual conflict of interest or there was an appearance of impropriety. As we have noted, "[d]etermination of whether a conflict of interest exists must be done on a case-by-case, fact-sensitive basis." Shapiro v. Mertz, 368 N.J. Super. 46, 53 (App. Div. 2004) (citing Wyzykowski, 132 N.J. at 523).

In Wyzykowski, the Court considered whether local planning board members, appointed by the mayor, could consider a development application he submitted in his private capacity, "or conversely," whether the mayor could appear before the board. 132 N.J. at 511. In considering the necessity of disqualification, "[t]he question will always be whether the circumstances could reasonably be interpreted to show that they had the likely capacity to tempt the official to depart from his sworn public duty." Id. at 523 (emphasis added) (quoting Van Itallie v. Borough of Franklin Lakes, 28 N.J. 258, 268 (1958)). It is not necessary to demonstrate actual proof of dishonesty because only the potential for conflict is necessary. Id. at 524. Decisions construing

11

N.J.S.A. 40A:9-22.5(d) adopt this expansive view, holding an appearance of impropriety, not an actual conflict of interest, creates a disqualifying situation.

For example, in Randolph v. City of Brigantine Planning Bd., 405 N.J. Super. 215, 222 (App. Div. 2009), we considered the application of subsection (d) of the LGEL's code of ethics, where the board chairwoman lived with a principal of the board's retained engineering firm. We phrased the issue as

> whether "the circumstances could reasonably be interpreted to show" that [the chairwoman's] relationship with [the principal of the engineering firm] "had the likely capacity" to tempt her to depart from her sworn public duty, thus eroding confidence by the public that she would make her own independent judgment as to [the developer's] application before the [b]oard.
>
> [Id. at 229 (quoting Wyzykowski, 132 N.J. at 523).]

We held, "the public could perceive that [the chairwoman's] personal involvement with [the principal of the engineering firm] could reasonably be expected to impair her objectivity and independence of judgment." Id. at 231.

Similarly, in Shapiro, we considered whether a municipal councilwoman's vote to appoint her husband to the planning board violated subsection (d) of the LGEL's code of ethics. 368 N.J. Super. at 49. In affirming the trial court's decision to set aside the appointment, "[w]e focus[ed] . . . not on any actual or potential personal or other interest which

[the councilwoman] might possibly have. We focus[ed] on the public's perception of an undesirable conflict." Id. at 55.

The Legislature, however, chose markedly different language to proscribe other types of conduct that violate the LGEL's code of ethics. We presume the Legislature was aware of and intended these differences. See In re Referendum on City of Trenton Ordinance 09-02, 201 N.J. 349, 366 (2010). We may assume the Legislature's use of different language signifies its intent to deal dissimilarly with other types of official conduct. See, e.g., State v. Valentin, 105 N.J. 14, 20 (1987) ("[A] comparative analysis of the language of a contemporaneous statute may, because of contrasting language applicable to similar subject matter, be indicative of an intent or purpose on the part of the Legislature to provide different treatment . . . .") (quoting Malone v. Fender, 80 N.J. 129, 136 (1979)).

By their plain language, other subsections of the code of ethics require that the public official, or in one instance, a member of the public, act with a specific purpose. Subsection (f), for example, prohibits the public official or employee from soliciting or accepting things of value "based upon an understanding that [it] . . . was given or offered for the purpose of influencing . . . the discharge of his official duties." N.J.S.A. 40A:9-22.5(f) (emphasis added). Subsection (g) prohibits the official's use of insider

13

information "for the purpose of securing financial gain . . . ."  N.J.S.A. 40A:9-22.5(g) (emphasis added).

Although the LGEL has engendered many decisions in the courts and at the agency level, only two of our published decisions have addressed subsection (c).[3]  In Jock v. Shire Realty, Inc., 295 N.J. Super. 67, 68 (App. Div. 1996), we considered "whether [Amato,] a member of a Zoning Board of Adjustment[, could] testify as an expert witness in support of an application for certain 'hardship' variances on behalf of a corporation of which he was the controlling stockholder."  We noted the seeming conflict between N.J.S.A. 40A:9-22.5(h), prohibiting public officers from appearing in pending matters before agencies of "the local government in which he serves," and N.J.S.A. 40A:9-22.5(k), permitting officials to represent themselves in proceedings concerning their own interests.  Id. at 73.  We concluded that subsection (k) did not "provide a general exemption to [subsection](h)," ibid., and that "Amato's appearance as an expert witness, seeking to convince his fellow

---

[3]  Unpublished opinions from our court have conflicting interpretations as to whether subsection (c) requires proof of a specific intent to secure an unwarranted benefit or privilege.  Similarly, our review of decisions filed by ALJs in various agency proceedings reflect a lack of uniformity regarding the issue.  Our research was unable to ascertain whether the LFB adopted and affirmed the ALJ's initial decision in some of these cases, although it appears in final agency decisions we have been able to review, that, consistent with its argument in this appeal, the LFB has held subsection (c) does not require proof that the local official or employee acted with a specific intent.

Board members to allow him to develop this property in violation of the zoning ordinance requirements, created at least the potential for conflict." Id. at 74.

Although not necessary to our decision, we also noted that Amato's appearance violated subsection (c). We reasoned, "[b]ecause an application for a variance necessarily seeks permission to violate the dictates of the zoning ordinance, 'a reasonably informed citizen could see [Amato] as seeking a favor or special treatment.'" Id. at 73 (second alteration in original) (quoting Wyzykowski, 132 N.J. at 531).

To the extent this dicta suggests the mere public perception that an official used his office to secure an unwarranted privilege or advantage is sufficient proof he or she violated subsection (c), we disapprove it. Amato's intent to secure a particular "privilege or advantage," i.e., the variance, was never at issue; indeed, his corporation filed the application and he then appeared at the hearing to testify as an expert in its favor. Our colleagues' statement was more relevant to whether the public would perceive Amato "used" his public office to obtain the variance.

The only other reported case addressing subsection (c) is In re Zisa, 385 N.J. Super. 188 (App. Div. 2006). There, the City of Hackensack purchased a piece of property intending to create a parking lot to alleviate the scarcity of

parking in its central business district. Id. at 191. Zisa, as mayor and member of the municipal council, voted affirmatively to issue bonds to finance the purchase of the property and subsequently voted to authorize its purchase. Ibid. Within two months, Zisa, as managing member of a limited liability corporation, purchased nearby property with the intention to lease it to the county school district. Id. at 191-92.

Knowing the school district required more parking than was available at the property he was about to purchase, Zisa had his private attorney negotiate the lease of additional parking spaces at the proposed municipal parking lot. Id. at 192. Once he secured the city's agreement, Zisa finalized his purchase of the property. Ibid. In the interim, Hackensack proceeded to solicit bids for the paving of the proposed municipal parking lot. Id. at 193. Ultimately, after soliciting the advice of the municipal attorney, Zisa voted, along with the other council members, to award the contract to a sole bidder, and thereafter voted repeatedly to authorize progress payments to the contractor. Ibid.

The LFB concluded that Zisa's actions regarding the paving contract violated subsection (c), "because the expenditure of public funds . . . 'secured the advantage of improving the parking for [Zisa's] tenant.'" Id. at 195.[4] In

---

[4] The LFB also cited Zisa for violating subsection (d) of the code of ethics. We also reversed on that ground, but we need not address our rationale.

16                                                                          A-4482-16T4

reversing, we noted there was nothing in the record demonstrating Zisa's tenant, i.e., the school district, required paved parking spaces, so there was no advantage to Zisa in having the lot paved. Ibid. We did not address whether subsection (c) required proof of specific intent.

Although the Legislature did not use the words "for the purpose of" in subsection (c) as it did in subsections (f) and (g), it nevertheless prohibited the use or attempted use of public office to achieve a particular end, i.e., "to secure unwarranted privileges or advantages . . . ." N.J.S.A. 40A:9-22.5(c). As such, the mere public perception of impropriety does not violate subsection (c); a violation requires proof that the public official intended to use his or her office for a specific purpose. Our conclusion is strengthened by the Legislature's decision to proscribe an official's attempted, albeit unsuccessful, use of his or her office to secure unwarranted privileges or advantages. By definition, to attempt something is "[t]o try to do, make, or achieve" it, whether successful or not. Webster's II New College Dictionary 74 (3rd ed. 2005).

As a result, based on subsection (c)'s plain and unambiguous language, we conclude that a public official or employee only violates this provision of the LGEL if she uses or attempts to use her official position with the intent to secure unwarranted advantages or privileges for herself or another. In this case, the ALJ found as a fact that Mondsini lacked such a purpose, and that her

only purpose in allowing MacNeal to use the Authority's gasoline was to keep the Authority operating during the crisis. The LFB accepted these factual findings. We therefore reverse the Agency's decision.

For the sake of completeness, we address whether Mondsini secured an "unwarranted privilege or advantage" for MacNeal by authorizing his use of the Authority's gasoline. Based on its interpretation of our decision in <u>Zisa</u>, the LFB concluded she did. The LFB emphasized that MacNeal obtained something unavailable to the public. It concluded that permitting him to fuel a personal vehicle was an unauthorized exercise of Mondsini's powers, because MacNeal was not an essential employee, and Mondsini could have provided a "fleet vehicle" for MacNeal to use as he sought gasoline from nearby vendors.

Pursuant to rules of statutory construction, we accord words "their generally accepted meaning." N.J.S.A. 1:1-1. "Unwarranted" is defined as "[h]aving no justification." <u>Webster's II New College Dictionary</u> 1240 (3rd ed. 2005). The legislative history of the LGEL provides no further guidance on what is an "unwarranted privilege or advantage," nor does our review of decisions under the ethics laws of some of our sister states that use identical language. <u>See, e.g.</u>, <u>N.Y. Pub. Off. Law</u> §74 (Consol. 2019); <u>Mass. Ann. Laws</u> ch. 268A, §23 (2018). In <u>Zisa</u>, we defined "unwarranted" consistently with its plain meaning, as a privilege or advantage "that is <u>unjustified or unauthorized,</u>

one that would permit the municipal official to obtain something otherwise not available to the public at large." 385 N.J. Super. at 196 (emphasis added).

Here, of course, although not designated before the storm as an essential employee, and, as the ALJ concluded, Mondsini did not ask MacNeal to come to the Authority, MacNeal was nevertheless one of its employees. We do not think, however, that being an employee in and of itself is dispositive of whether the privilege or advantage is "unwarranted."

However, once MacNeal was there, Mondsini exercised her executive authority and told MacNeal he could use the Authority's gasoline, hoping he could secure more gasoline and food for essential workers. There is no authority cited by the LFB that prohibited Mondsini from exercising her powers this way.

This is not to say that simply authorizing some particular use of agency personnel or resources immunizes a local official or employee from violating subsection (c). If, for example, the privilege or advantage was secured through the unauthorized exercise of an official's duties, or the exercise of those duties in an unauthorized manner, the official could be subject to penalties under subsection (c). See, e.g., N.J.S.A. 2C:30-2(a) (by way of analogy, defining the criminal offense of official misconduct).

However, there was no evidence that Mondsini exceeded her authority under the Sewerage Authorities Law, or the Authority's governing documents. Nor do we accept the LFB's reasoning that Mondsini acted in an unauthorized manner because other options existed, e.g., providing a "fleet vehicle" to MacNeal. We refuse to engage in such "Monday morning quarterbacking." Even when applying broader principles of disqualification based upon the appearance of competing public and private interests, the Court made clear: "The [LGEL] must be applied with caution, as '[l]ocal governments would be seriously handicapped if every possible interest, no matter how remote and speculative, would serve as a disqualification of an official.'" Grabowsky, 221 N.J. at 554 (second alteration in original) (quoting Wyzykowski, 132 N.J. at 523).

Lastly, the LFB rejected any consideration of the undisputed fact that Mondsini faced an emergency of significant magnitude involving a threat to the public safety of untold thousands and criticized the ALJ's conclusion because it created an "emergency exception" to the LGEL. This contention overlooks a longstanding and essential premise of our jurisprudence that predates enactment of the LGEL, namely that in the area of ethical concerns, evaluation of any public official's actions "must be carefully evaluated based

20 <span>A-4482-16T4</span>

on the circumstances of the specific case." Ibid. (citing Van Itallie, 28 N.J. at 268).

We reverse in A-4482-16.

III.

We have already addressed most of the issues raised by the Authority's appeal. To the extent the Authority argues its employees and officers were not subject to the jurisdiction of the LFB regarding enforcement of the LGEL, the argument lacks sufficient merit to warrant discussion in a written opinion. R. 2:11-3(e)(1)(E).

We otherwise dismiss A-4504-16 as moot.

I hereby certify that the foregoing is a true copy of the original on file in my office.

CLERK OF THE APPELLATE DIVISION